### HEAD v. THE STATE, 44 Miss. R., 731.

#### HOMICIDE.

Art. 1, sec. 13, of the Constitution, and the act of 20th July, 1870, p. 88, abolish property qualification for jury service, and impose that duty on all citizens alike, who are not specially exempt; but the previous laws regulating the manner of selecting, summoning, and empaneling juries, and preferring objections thereto, still apply, unless abrogated by the Constitution itself.

By Art. 131, Rev. Code, 499, no objection by plea or otherwise shall be raised to empaneling the grand jury; but the empanelment shall be conclusive evidence of its competency and qualification; and after it is organized and charged it is too late to prefer objections. Although any person whose conduct may be the subject of inquiry or investigation, may challenge, or except to, the array for fraud.

By Art. 250, Rev. Code, 613, the courts are instructed to regard all the laws and statutes relating to the mode of selecting, summoning, and empaneling all juries as *directory* merely. After they are empaneled and sworn, though it be in an irregular or informal mode, they must be deemed legal and competent in both civil and criminal proceedings.

It is the duty of the court to superintend the selection of the jury, in order that a fair and unbiased jury may be had, and herein the court has a very large discretion; and the action of the circuit court in this behalf will not be subject to revision here, unless a violation of law, or a gross and injurious exercise of discretion, is shown. 43 Miss., 641.

The declarations of the defendant, made at the time of the shooting, as to the effect of his shot, are not "confessions in the technical sense," but connect themselves with the act, and form part of the *res gestæ*, and are clearly admissible in evidence.

To discredit a witness, it is competent to prove that he had made discordant statements at other times and places; but to re-establish his credibility, or to support what he has deposed on the trial, it is inadmissible to prove that he has made the same statements to third persons.

It is competent for the defendant to put to the state's witnesses the interrogatory, "What is your avocation?" and the state has no right to interpose objections to the answer; the witness may decline to answer where it would tend to criminate him or her, or bring them into disgrace or reproach; but this is the privilege of the witness, and of which it is the duty of the court to advise him.

The verdict of the jury will not be disturbed for any supposed error in the instructions, where it is manifestly right on the evidence ; and it does not appear that the defendant, was prejudiced by any one of the charges of the court. 37 Miss., 350. Nor is it error to refuse instructions asked, where the true principles of law applicable to the case are embraced in those already given.

The instruction that "it is incumbent on the state to prove the allegations in the indictment, or to make out its case. When a killing has been proved, the burden of proof changes, and it is then incumbent on the defendant on the defendant to show excuse or justification, &c., and if he has failed to do this, the jury may find him guilty," is erroneous; the true proposition of law is, "if there be no excuse or justification for the homicide by the defendant, shown in the evidence adduced by the state, then he is guilty of murder, unless he has by his evidence proved excuse or justification.

The law presumes a man to intend the necessary consequences of his act; hence the use of a deadly weapon is *prima facie* evidence of malice, unless it be used to disable an adversary in the very act of making a murderous and malicious assault ; and then the presumption of malice is overcome.

Every man is justified in protecting his life and limb at whatever hazard, but the danger must be present, imminent, and immediate ; a mere fear or apprehension, arising from previous threats communicated, afford no excuse, unless at the time of the killing an effort was being made to put the threats in execution, and a real or apparent necessity existed at the time to slay in order to prevent it.

. It was no error to refuse to instruct the jury "that if an armed person (not armed with reference to a controversy with the deceased) became involved in a difficulty with deceased, and took his life with such weapon, that malice cannot be inferred simply from the fact of the use of such weapon." The mere fact that the law permits a man to bear arms for self-defense, does not in the slightest degree diminish the responsibility for an improper use of them.

Error to Lauderdale circuit court. LEACHMAN, J.

At the August term, 1870, of the circuit court of Lauderdale county, the defendant, Head, was jointly indicted as principal, with one Smith as accessory, for the murder of Benjamin Doak. At the same term, defendant Head filed to said indictment his plea in abatement, alleging that the body preparing said indictment did not constitute a legal grand jury—1. Because they were not selected according to the requirements of the constitution and laws of the state. · 2. Because they were selected from the freeholders and householders of said county, over twenty-one years of age, and under sixty ; whereas, by law, no distinction shall be made among the citizens, &c., in drawing, selecting, or summoning, &c., and prayed that said indictment be quashed. This plea was overruled by the court.

.At the same term motion was made to quash the special venire in the case, because a number of names were drawn on the same, but which were rejected and not placed in the panel, without any or a sufficient cause. This motion was overruled. .

On the trial of the case, the state introduced A. C. Jackson as a witness, who says he lives in Meridian—was informed, on

the night of the 17th of April, that his step-son, Benjamin Doak, had been killed, about one and a half mile from Meridian, near Mrs. Parker's; sent some young men out with a wagon to bring in the body; recognized it as the body of said Doak; it was lifeless when brought in; a shot or ball had entered the body a short distance above the left nipple; had seen said Doak on the evening of that day in apparently good health.

W. M. Nix testified: Saw said Doak at 5 or 6 o'clock on the evening before his death; he informed witness that he was going to Mrs. Parker's to a party; saw defendant Head and one Wm. Smith, who said they were going to the same place; about 11 o'clock, same night, Jackson, step-father of Doak, requested witness and others to take a wagon and go out to Mrs. Parker's, and bring in the body of said Doak; went out, and found Doak's body fifty or sixty yards from the house, life being extinct; did not examine the body till it was brought to Meridian; found he had been shot about as stated by witness Jackson.

Wm. McDuffee testified: Went out with W. M. Nix; found the body, as stated by him; that between the body and Mrs. Parker's house the bushes were pretty thick, about four feet high; that one standing at the house could not see more of a man's body than from the breast upwards, where the body was found; deceased was in his shirt-sleeves; was about of same height as defendant Head; found no arms or weapons on or about deceased's person; his shirt was burnt around where the ball had entered; that the muzzle of the weapon must have been within three or four feet of the body when it was discharged; the night was pretty dark; had to light a candle to put the body in the wagon.

Mary Anderson testified: Was at the house of Mrs. Parker the night Doak was killed near there; said Doak came up about 7 o'clock; was quite drunk; said that Head had stolen his money, and that he (Doak) intended to kill him; saw no arms about him; that about an hour after this, defendant Head and one Wm. Smith came up; one Partee told defendant that Doak was in the house, and had threatened to take his life, whom he accused of stealing his money; and advised him not to go where Doak was; defendant replied, "I'll go and see Mr. Doak about

it;" saw in one hand a pistol, and in the other a pocket-knife; he went around to the other side of the house where Doak was; Doak said to defendant, "Let us take a walk;" and they went off from the house fifty or sixty yards, and stopped; heard Doak say to defendant, "You stole my money; you are a God d——d puke;" defendant said, "You are another;" Doak replied, "You are a God d——d liar;" about that time heard the report of a pistol, and saw the flash where they were standing; about ten minutes afterwards, heard Doak say to defendant Head, "You have arms, and I have none; you have stole my money; I don't want to live; kill me, d——n you;" that she then heard the report and saw the flash of another pistol and shot; saw Doak fall, and afterwards saw Head stooping over him; shortly afterwards saw defendant and William Smith going towards Meridian; that, about thirty yards from the house, a Mr. Opell approached Head and said, "Halt, Jimmy," and asked him if he had killed Doak; defendant replied, "I have shot red-hot—" (Objection was made to this answer, and overruled). Witness continued: "red-hot water out of him;" Wm. Smith was standing at the corner of the house when the first shot was fired, but went to the place of difficulty before the second was fired. On cross-examination by defendant's counsel, witness was asked, "What was her avocation?" The state objected to the question, and it was sustained by the court.

Josephine Partee testified: Was at the house of Mrs. Parker on night of the killing of Doak; he came there drunk, and said Head had stolen his money, and that he intended to kill him. The testimony of this witness being substantially the same as that of the preceding witness, the same questions on cross-examinations being asked and overruled.

Cynthia Parker testified: Is the daughter of Mrs. Parker, near whose house the killing occurred, &c. Her testimony is substantially the same as that of the two preceding witnesses. On cross-examination, to the question by counsel for defendant, "What is your avocation?" replied, "I make my living by sleeping with men; that is it—if you must know how I make my living;" "that Mollie Andrews and Joe Partee, who had been sworn as witnesses for the state, were her associates." Witness

was talking with Doak when Head came up to him; Doak had his coat off; saw no weapons about his person; he said to defendant, "Jim, you have gone back on me," and placed his arm around his neck, and asked him to take a walk; Head had a pistol in his hand.

Major Mimms testified: That as marshal of Enterprise, he had, in April last, arrested Head and Smith at that place, as suspicious persons, and put them in prison; they inquired for a Meridian newspaper; and on being handed the "Mercury," which contained an account of the killing of Doak, they read it, and seemed much excited over it; in obedience to a despatch from Meridian, he ironed and sent them to Marion jail, Lauderdale county.

Jennie Pullum corroborated substantially the testimony of Mollie Andrews and Josephine Partee, before sworn and examined.

The state next introduced said Wm. Smith, who testified that, on the night of the killing, he went with Head to Mrs. Parker's; Head said he had had a fuss with Doak, and if he said anything to him, he intended to kill him; some one told Head that Doak was there drunk, and had said defendant had stolen his money, and not to go round where Doak was; Head said, "I'll go around and see him; I reckon there will be no fuss;" defendant had, at the time, a pistol in his hand, and a knife in his belt; he and witness went round to Doak, who was very drunk; Doak said to defendant, "You have gone back on me," and asked defendant to take a walk with him; threw his arm around his neck, and they went off some fifty yards; witness followed behind; they sat down on a log; after some words a scuffle ensued, and a pistol was fired off; Head had a pistol in his hand during the scuffle; could not see what caused the pistol to fire off; the parties then separated; witness returned to where they were; they were two or three steps apart, quarreling; Doak said to defendant, "You have gone back on me; I don't care to live; kill me, d—n you; you are armed, and I have none; shoot and be d——d, if you want to;" defendant then fired his pistol at deceased, who then fell; defendant then said, "Die, you son of a b—h;" witness then went towards

the defendant, who said, "Don't approach me, or I'll shoot you;" witness then asked, "Have you killed Doak?" (Objections to this question were made and overruled.) Defendant replied, "Yes, I have shot the red-hot —— out of him;" witness and defendant then came to Meridian, and next day were arrested at Enterprise. Witness stated that he had been indicted jointly with Head, as accessory, but the case as to him had been *nolle prosequi*, in order to make a witness of him for the state.

Defendant then introduced as a witness one J. P. Allen, who testified that in May or June of this year (1870) he went into the prison at Marion, where defendant and William Smith were confined; that said Smith voluntarily stated to him that he was present at the killing of Doak, which took place in this manner:—Defendant and Doak took a walk into the bushes fifty or sixty yards from Mrs. Parker's house about nine or ten o'clock at night; that they got into a quarrel; that Doak tried in a scuffle that ensued to take Head's pistol from him; that in the scuffle, after Doak had got hold of Head's pistol, and while the same was in Doak's hand, it was accidentally discharged, and thus Doak shot himself; that Head, the defendant, was present at this statement, and said if Smith should be a witness for him he had no fears, if Smith would swear the truth. Smith further stated that he is defendant's brother-in-law, having married his sister.

The state then introduced as a witness one Willis Meadow, to show that Smith's evidence on the stand was consistent with what he had stated previous to the trial, and during the term of court. Defendant objected, but it was overruled by the court, and witness testified—that he was bailiff of the court; was present at an interview between the district attorney and Smith, at the present term. The district attorney asked Smith what his testimony would be, and to state the truth; that Smith said that if let alone he would swear the truth, and went on then, and his statement was about the same as he had testified to on the stand; and the district attorney then said if such was his testimony he would dismiss as to him. Defendant moved to exclude this testimony of Meadow from the jury, it being illegal. The motion was overruled by the court.

The court then gave the following instructions to the jury on behalf of the state :

2. The laws of the state define murder to be the killing of a human being without the authority of law, by any means or in any manner: 1st. When done with deliberate design to effect the death of the person killed, or of any human being; 2d. When done in the commission of an act imminently dangerous to others; and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual; 3d. When done without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, arson, or robbery, or in an attempt to commit such felonies.

3. While it is true that the defendant is entitled to the benefit of any reasonable doubt, it is also true that absolute, metaphysical, demonstrative certainty is never required; and that which amounts to mere probability or supposition, is not what is meant by reasonable doubt.

4. While it is true that every defendant is presumed to be innocent until the contrary appears, and that it is always incumbent on the state to make out its case, yet it is also true that when the state has made out a *prima facie* case—that is, as in this case, when the killing has been proved—the burden of proof changes, and it is then incumbent on the defendant to show sufficient excuse or justification for the killing; and if the defendant has failed to do this, the jury may find the defendant guilty as charged.

5. In order to justify the killing of a human being, there must be some overt act on the part of the person slain, indicating a present intention to kill the slayer, or to do him some great personal injury; and the danger of such design being accomplished must be imminent; that is to say, immediate, pressing, unavoidable, at the time of killing.

6. A bare fear that a man's life may be in danger from the violence of another, however well founded, and whatever may be the character of the man feared, unaccompanied by any overt act or demonstration indicating an intention immediately to kill such party, or to do him some great personal injury, will

not justify him in killing the other, by way of precaution, if there is no actual danger at the time of killing. Both the design to commit a felony, or to do such person some great personal injury, and the imminency of the danger of such design being carried into execution, must both exist, to justify the man then in fear of his life to kill; and this imminency of danger means danger at the time of the killing.

7. To make a homicide justifiable on the grounds of self-defense, the danger must be actual, present, and urgent; or the homicide must be committed in such circumstances as will afford reasonable ground to the party charged to apprehend a design to commit a felony, or to do him some great bodily harm, and that there is imminent danger of such design being accomplished; hence the mere fear, apprehension, or belief, however sincerely entertained by one man that another designs to take his life, will not excuse or justify the killing of the latter by the former.

8. When the danger is neither real nor urgent, to render a homicide justifiable or excusable within the meaning of the law, there must be at least some attempt to execute the apprehended design, or there must be reasonable ground to apprehend that such design will be accomplished, and the danger of execution imminent. A person may have a lively apprehension that his life is in danger, and believe that the apprehension is great and reasonable, but if he act upon them, and take the life of a human being, he does so at his peril. He is not the final judge of the reasonableness of his grounds of belief upon which he acted, but that is a question alone for the jury to determine.

9. Mere threats to take the life of a party, or to do him some great bodily harm, furnish no justification or excuse for the commission of a homicide, unless from the character of the party making such threats, and the circumstances under which they were made, they are calculated to put the party threatened in a just and well-grounded fear that he is in danger of his life or of some great bodily harm; and these to excuse or justify the homicide, the party making such threats must offer to put them in execution at the time of the killing.

10. Unless the jury believe, from the evidence, that the de-

fendant, at the time he killed the deceased, was in imminent danger of his life, or of some great bodily harm, or that he had a well-grounded apprehension of great danger to his life or limb, from some overt act on the part of the deceased, made at the time, and that he acted upon such fear at the moment of the killing, then he was not justified in taking the life of the deceased; and if the jury believe, from the evidence, that the defendant did not act at the moment he killed the deceased from such well-grounded fear of immediate and pressing danger of his life or limb, they may find him guilty as charged in the indictment.

11. Malice is an essential ingredient in the crime of murder, but malice may be either express or implied; and when there is no direct, positive and express proof of malice, it may yet in many cases be inferred from other circumstances in the case, and the jury may always infer malice from the deliberate use of a deadly weapon.

12. While malice is necessary to constitute the crime of murder, it yet matters not how short a time before the commission of the offense the malicious purpose was conceived; and the jury may look alone to the instrument used, and to the manner of using it, as evidence of the malicious intent, without any proof of previous malice.

13. The jury, in arriving at a verdict, should look to all the evidence in the case as a whole, and if they believe the material and substantial facts are sufficiently proved to establish the guilt of the defendant, they may make up their verdict upon the proof of such facts alone, and may wholly disregard any variance or contradiction in the testimony of the witnesses about matters which are not, in the opinion of the jury, material or necessary to the issue.

14. Manslaughter is defined by the laws of the state, to be the killing of a human being without malice, in the heat of passion, but in a cruel or unusual manner, without authority of law, and not in necessary self-defense; or the killing of another in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.

15. The testimony of the witnesses introduced by the state not being impeached, and no evidence being offered by the defendant to impeach them, their evidence is competent for the state, and the jury cannot reject it, but should give it such weight as admissible evidence is entitled to under all the circumstances in which it was offered to the jury.

To all of which instructions the defendant objected, and excepted at the time.

The defendant then asked the court to give sundry instructions to the jury in his behalf, and which were accordingly given, to the number of fifteen; but the following were refused, to which action of the court, so refusing, the defendant then and there excepted:

1. The court is asked to instruct the jury, that under the evidence in this cause they are authorized to find the defendant "not guilty."

2. The jury should not convict the defendant upon the testimony of an accomplice, or accessory, alone, and without corroboration in some point material to the issue.

3. That by the laws of this state each man has the right to bear arms about his person, and if Head had on his person a deadly weapon, but had not armed himself for the purpose of using the same against Doak, or any other person, unless it became necessary in his self-defense, and being thus armed, he became involved in a difficulty with Doak, and took the life of Doak with such weapon, then malice cannot be inferred simply from the fact of his using such deadly weapon.

4. That it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth.

5. That mere circumstances will not authorize a conviction, unless they are so strong as to exclude every other hypothesis but that of the defendant's guilt.

6. That although the jury may be satisfied from the evidence that the prisoner killed the deceased, yet if the jury are satisfied from the evidence that the prisoner had reasonable grounds to apprehend a design on the part of the deceased to take the prisoner's life, or to do him some great bodily harm or great personal injury, and there was imminent danger of such design

being accomplished, then they must find the prisoner not guilty.

7. That the evidence must exclude every hypothesis except that of the guilt of the prisoner, and every conclusion from the evidence must be consistent with his guilt, and inconsistent with his innocence, or.they must find the prisoner not guilty.

8. That it devolves upon the state to make out to the satisfaction of the jury, all the material allegations of the indictment; that mere preponderance of evidence in favor of the state will not authorize a conviction, unless such preponderance satisfies the jury, to a moral certainty, of the guilt of the prisoner; and if the jury are not satisfied from the evidence, to a moral certainty, of the truth of every material allegation in the indictment, they must find the prisoner not guilty.

9. That unless the evidence against the defendant should be such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense imputed to him, then the jury must find him not guilty.

10. That unless the evidence against the prisoner should be such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense charged against him, they must find him not. guilty.

11. That the jury must be satisfied from the evidence, beyond a reasonable doubt, that the prisoner killed the deceased, and the killing was done with malice aforethought; that is, that it was a premeditated killing, or they must find the prisoner not guilty.

Whereupon the jury returned the following verdict indorsed upon the instructions which had been given them, to wit: " We, the jury, find the defendant guilty of manslaughter in the first degree;" the verdict not being signed by any one as foreman of the jury, or by any member of the jury. A motion for a new trial was overruled, whereupon the prisoner was sentenced to the penitentiary for a term of seven years.

The defendant, Head, made the following assignment of errors:

1. The court below erred in not sustaining the plea filed to the legality of the grand jury which preferred the indictment,

and also in overruling the motion to quash the indictment for reasons set forth in the plea, and in the motion to quash.

2. The court erred in not sustaining the plea to the special *venire*.

3. The court erred in not quashing the special *venire*.

4. The court erred in its ruling on the plea to quash the special *venire*.

5. The court erred in refusing a continuance of the same.

6. The court erred in its ruling upon the admissibility of evidence.

7. The court erred in admitting the statements and confessions of the defendant without a proper predicate, showing they were free and voluntary.

8. The court erred in not permitting the defendant to prove what was the " vocation of certain witnesses, their business, how they made their living, and who their associates were."

9. The court erred in admitting the testimony of the witness Meadow.

10. The court erred in admitting illegal evidence to corroborate and sustain the evidence of the witness Smith.

11. The court erred in giving the several charges on the part of the state.

12. The court erred in refusing the several charges asked for by the defendant.

13. The court erred in pronouncing sentence on the verdict, or on what purports to be the verdict of the jury.

14. The court erred in pronouncing sentence upon the defendant without asking him if he had anything to say why sentence should not be pronounced.

15. The court erred in pronouncing sentence in the absence of the prisoner.

16. The court erred in refusing a new trial of the cause.

17. The court erred in allowing the state to object to the answers by witness Smith, on the ground that such answers would criminate him.

*Coleman & Roberts*, for plaintiff in error.

The court erred in overruling the plea in abatement to, and

the motion to quash the indictment. In support of this plea and this motion, see act Leg., July 20, 1870, p. 88; 1 Lead. Crim. Cases, 267, and cases there cited. The constitution of 1869 abrogated all qualifications previously existing as to grand and petit jurors. See also Barney v. The State, 32 Miss., 73. The record shows that the grand jury who found this indictment were not selected from the entire class of persons made eligible as such. Const., art. 1, sec. 13; act July 20, 1870, p. 88; McQuillen v. The State, 8 S. & M., 596, 597; Portis v. The State, 23 Miss., 580; Stokes et al. v. The State, 24 Miss., 623; Leathers v. The State, 26 Miss., 77.

The court ought to have quashed the special *venire.* Art. 295, Rev. Code, 620, which prescribes the manner of drawing the *venire,* allows the officer no discretion to throw out the names of any persons drawn by him; and the statute of 1870, already cited, p. 88, provides that no distinction shall be made among citizens in selecting juries. See Boles v. The State, 24 Miss., 454. If the court erred, as we think it did, in these rulings, the prisoner is entitled to his discharge. Const. 1869, art. 1, sec. 5; Hart v. The State, 25 Miss., 378; Slaughter v. The State, 6 Humph., 410; 22 U. S. Digest, 83, sec. 19; 20 U. S. Digest, 124, sec. 14; 11 Iowa, 350; 18 U. S. Digest, 93, sec. 5; 4 Cal., 376; 13 U. S. Dig., 71, sec. 1; 14 Swann, Tenn., 35; 2 Law Times Dig., p. 25.

On the question of the admission of the confessions of defendant, see 40 Ala., 58; State v. Rice, Miller, Goodloe and Patrick; and State v. Davis, 17 Ala., 415. Also U. S. Crim. Digest, 160; Bush. N. C. Rep., 239.

That the witnesses should have answered the question put to them as to " what was their respective ' avocations,' " &c., see 1 Greenl. Ev., sec. 454–'5–'6–'7–'8–'9, and note; and even if the answer would criminate the witness, the privilege to decline is merely personal with the witness. 37 Miss., 402, 403, 404.

The illegality of the testimony of the witness Willis Meadow, seems too clear to require either argument or authority.

The charges given on behalf of the state are erroneous; especially charge number 4. Here the court invades the province of the jury by assuming that the killing was done by the de-

fendant, ignores the *venire* altogether, and tells the jury they may find the defendant guilty. This charge also announces an erroneous principle of law. The true principle is that when the killing is proved the burden of proof changes, unless the evidence which proves the killing also furnishes the excuse. 28 Ala., 89; 37 Ala., 142; McDaniel v. The State, 8 S. & M., 417.

The charge numbered 5 is likewise erroneous. The principle governing is, "the circumstances must be such as to create a reasonable belief in the mind that such necessity exists." 26 Ala., 23; Carroll v. The State, 23 Ala., 28; Oliver v. The State, 17 Ala., 587. And the conclusion of the 6th charge is similarly erroneous.

Charges 8, 9, 10 are erroneous, especially the latter, which assumes the killing by the defendant, and ignores the venue of the killing altogether. It does not leave it to the jury to determine whether the defendant killed the deceased or not, or under what circumstances, or where the killing may have occurred.

Charge 15 deprives the defendant of the benefit of a reasonable doubt. What constitutes murder is a question of law; the belief of the jury is another question. They should be informed what constitutes sufficient, material, and substantial facts—the jury are not competent to determine what facts "are material and necessary to the issue."

Charge 15 invades the province of the jury in assuming that the witnesses for the state were not impeached, and that no evidence was offered to impeach them, and declaring that the evidence for the state was competent. The witness Smith was directly impeached by proving statements made out of court totally at variance with his sworn testimony, and which he swore he never made. Besides, this charge is in direct conflict with charge 9, given at defendant's request, and the court cannot say which charge may have influenced the jury.

The court erred in refusing the first charge refused by the court on the part of the defendant. It does not assume that in giving it the court authorized the jury to find "not guilty;" it declares to the jury that by virtue of authority vested in them, they have the right to find "not guilty;" not that they are authorized by the court to do so.

In support of the charge refused, see 1 Greenl. Ev., secs. 380, 381.

In support of the third charge so refused, see *ex parte* Wray, 30 Miss., 689–'80; Cotton v. The State, 31 Miss., 504.

In support of the fourth charge so refused, see Algheri v. The State, 25 Miss., 584.

In support of the 5th charge so refused, see Mickle v. The State, 27 Ala., 20. Under the 6th refused charge, see Cotton v. The State, 31 Miss., 504. Under the 7th charge refused, Commonwealth v. McKie, 1 Lead. Crim. Ca., 295; Commonwealth v. York, ib., 322, and dissenting opinion of Wild, J.

In cases of felony, it is well established that the record must show that the prisoner was present in court when the sentence was pronounced, and was asked by the court if he had anything to say why sentence should not be pronounced on him. 1 Parker's Crim. Rep., 474; citing Blackstone and Chitty in its support.

*J. S. Morris*, attorney general.

The first question presented by the record is, can any exception be taken to a grand jury after it was sworn and empaneled? This question, it is submitted, is entirely disposed of by the statute. Rev. Code of 1857, p. 499, art. 131. And although the constitution of 1869 and the act of the legislature of 1870 may have changed the qualifications for grand jurors, it is submitted that the rule of *practice*, prescribing the time and manner of exception to a grand jury, remains unchanged.

But suppose that this grand jury were in fact an exception to the general rule, and that objection could be taken and considered, under a plea in abatement, or motion to quash the indictment in this case, or by motion in arrest of judgment (which is denied)—was this grand jury, in fact, illegally constituted? The only ground relied on to establish its illegal constitution is the *assumption* by counsel that its members were not selected "from the entire body of persons liable to jury service in the county," but from householders and freeholders alone; and to prove this, a copy of the order of the board of supervisors of the county, appointing the grand jurors, is

embodied in the bill of exceptions, and quoted—or rather misquoted—as showing that such was the fact. And all the arguments and authorities urged upon this point are made to depend upon this assumption and this misquotation of that order.

It is most remarkable that learned counsel should be betrayed into such a mistake. The order of the board of supervisors shows no such thing, but the very reverse. The order is as follows:—" Ordered by the court that the *following named persons* be and they are hereby appointed grand jurors for the August term of the circuit court of said county," &c. Not one word is said about freeholders or householders, or any other qualification or description, except that they are described by their *names*, and as *persons* of their respective " beats" from which they were respectively selected. Hence, all this part of the assignment of errors vanishes, and the arguments and citations of authorities have no application.

It is true that the clerk of the circuit court in the *venire facias*, and in the entry on the minutes, refers to the persons selected, as " free or householders;" but this is mere *form*, resulting probably from the habit and practice in his office under the former statute, and may be likened to the habit, still very common, of describing defendants in indictments by the addition of " yeoman," " laborer," or " spinster" after the old forms, but, without any reference to the facts. Or it may have actually occurred that, although selected from all the competent persons in the county, those selected were by accident all freeholders or householders. In any event, as the record does not show any misconduct in the selection of the members of the grand jury by the board of supervisors, or by the circuit court, in examining, swearing, electing, or impaneling them, the grand jury, even if subject to exception and objection in the manner and at the time it was attempted in this case, must be presumed to be a good, regular, and valid grand jury. In support of this proposition, see the following familiar cases : Dowling v. The State, 5 S. & M., 644; Cody v. The State, 3 How., 27; Thomas v. The State, 5 How., 20; Easterling v. The State, 35 Miss., 210; 2 Porter (Ala.), 100; Grah. &·Waterman on New Trials, 717; Stewart v. The State, 1 Ohio, 66.

2. The next question is as to allowing the counsel for the defense to ask female witnesses for the state, in cross-examination, questions respecting their own "occupations" and "associations." These questions, as shown from the statements of other witnesses in the case, and from all the circumstances, were asked solely for the purpose of degrading, embarrassing, and exposing the witnesses under cross-examination to a criminal prosecution; and, whether asked for such a purpose or not, they necessarily and manifestly had this tendency and effect. Besides, the questions were totally *irrelevant to the issue before the jury.* And under these circumstances, it was the duty of the court to interfere, even without objection, to prevent the question from being answered. See U. S. v. Dickinson, 2 McLean, 325; U. S. v. Vansickle, ib., 219; Lohman v. People, 1 Comst. 379; Howell v. Comm., 5 Gratt., 664; Roscoe's Nisi Prius, Evi., 175; Comm. v. Churchill, 11 Metc. Mass. R., 538; Comm. v. Moore, 3 Pick., 194; Smith v. Castles, 1 Gray, 112; People v. Mather, 4 Wend., 251–257; Barnes v. The State, 19 Conn., 398.

3. As to the instructions for the state, objected to because bearing on the weight of evidence, and thus invading the province of the jury. The objection in this case must certainly be disallowed, as falling within the principle laid down in the case of Wesley v. The State, 37 Miss., 350.

4. In respect to objections to other instructions, it is sufficient to say that all the instructions, when construed together, *as a whole,* contain a fair and correct exposition of the law applicable to the case; and this is all the defendant had a right to claim. Childress v. Ford, 10 S. & M., 29; Mask v. The State, 36 Miss., 91–94; and authorities cited in the opinion of the court.

5. The verdict and judgment are clearly right under the proof. Indeed, it can scarcely be denied that the sentence is far less severe than the accused could have reasonably expected, considering the magnitude of his crime, and the facts and circumstances under which it was. perpetrated. And even "error in instructing the jury is *no* ground for a new trial, if it is manifest that the verdict is correct." Cameron v. Watson, 40 Miss., 191. And a righteous verdict cures the error of admitting illegal testimony. Mary Washington v.

McIntosh, 37 Miss., 670; Josephine v. The State, 39 Miss., 613.

SIMRALL, J.:

1st. It is claimed, first, that the indictment ought to have been quashed, because the grand jury was not constituted in accordance with law, to wit, Art. 1, § 14, of the Constitution, and the act of July 20th, 1870, Pamphlet Acts, 88. The combined effect of these provisions is to abolish property qualification for jury service, and impose the duty on all citizens alike, who are electors, and not within some special exemption. In all other respects, as to the mode of selecting, summoning, empaneling, and preferring objections, the previous laws, not abrogated by the Constitution and act of 1870, apply.

The judicial records of the country furnish mortifying testimony that many culprits have gone free, unwhipped of justice, because of technical exceptions taken to the grand jury who preferred the indictments. For remedy of this sore grievance, the legislature, in 1859, made two important amendments to the law. First, no objection by plea or otherwise shall be raised to the empaneling of the grand jury; but the empanelment shall be conclusive evidence of its competency and qualifications. Rev. Code, 449, art. 131. When the body has been organized, sworn, and charged, it is too late to prefer objections. Any person interested, whose conduct may be the subject of its inquiry and investigations, "may challenge, or except to, the array for fraud." This simply cuts off the plea in abatement, challenging the fitness or qualification of the body, or of any of its members. Art. 250, Rev. Code, 613, instructs the courts to regard all the laws of the state relating to the mode of selecting, drawing, summoning, and empaneling all juries, as *directory merely*. And after they are empaneled and sworn, though in an irregular or informal mode, they must be esteemed legal, and competent to perform all the duties belonging to juries; and this applies to both civil and criminal proceedings, to grand and petit juries. The cases referred to by counsel for the plaintiff in error occurred prior to the adoption of the Rev. Code, and

doubtless suggested to the legislature the necessity of a reformation of the law. It follows that the exception taken to the grand jury ought not to prevail.

2d. It is the duty of the court to superintend the selection of the jury, in order that it may be composed of fit persons. Large discretion must be confided to the court in the performance of this duty. Nor will the action of the circuit court in this behalf be the subject of review here, unless some violation of law is involved, or a gross and injurious exercise of discretion is shown. The primary object is to insure a fair, unbiased jury. Brown v. Gilliam's Ex'r, 43 Miss., 641. The objection to the *special venire* is not well taken.

3d. It is next urged that the confession of the prisoner ought not to have been admitted, because he was not warned of the probable consequences, and it did not appear to have been voluntary, &c. There does not appear in the record such formal confession as the case cited by counsel refers to. The defendant, who was within a few paces of the parties at the time of the shooting, and saw and heard what was done and said, deposes as to the response of the defendant as to the effect of his shot. This response was heard by a female witness, some thirty or forty paces off. The statement connects itself with the act, and forms part of the *res gestæ*. It was clearly admissible.

For the purpose of discrediting a witness, it is competent to prove that he made discordant statements at other times and places; but to re-establish credibility, or to support what he has deposed to on the trial, it is inadmissible to prove that he has made substantially the same statements to a third person. Many years ago the British courts received such testimony, but afterwards its propriety was doubted, and finally repudiated. The weight of authority and reason is against it. Parker's case, 3 Doug., 242; 1 Starkie's Ev., 187; Brazier's case, 1 East P. C., 444; 3 Barb., 410; 24 Wend., 465; 13 Vt., 208; Conrad v. Griffin, 11 How. S. C. Rep., 490. The testimony of the witness Meadow, detailing the narrative made by the witness Smith to him, ought to have been excluded.

The interrogatories put to the female witnesses were doubtless for the purpose of presenting them as infamous characters,

and casting more or less suspicion on their testimony. We think the questions were legitimate. The witness may decline to answer a question which may tend to criminate him or her, or bring them into disgrace and reproach. But this is the privilege of the witness. It is the duty of the court to advise the witness of this privilege to answer or not. The state cannot interpose the objection. Nor does it follow, if these females were of the character shadowed forth in the testimony, that they must be discredited. The jury is the judge of the credibility of a witness. If the law esteemed a class of persons untruthful because of a vocation reprehensible and immoral, it would exclude them altogether. The manner, freedom from bias, consistency, and general bearing and deportment of a witness, are all subject to the scrutiny of the jury, affording generally abundant indicia for a proper weight of testimony. We esteem it not impertinent to venture the suggestion to those representing the public justice in important trials, not to raise or press objections to testimony, especially on collateral and not vital points, unless clearly inadmissible. It is manifest that the answers to the interrogatories objected to by the state's attorney would have had no material influence on the issue before the jury. The state has no right to exclude the answer, if the witness is willing to give it. In such cases, it is the duty of the court to admonish the witness of her situation and privilege.

We would not disturb a verdict for any supposed error in the instructions, where the verdict is manifestly right on the evidence, and it does not appear that the accused was prejudiced by any one of the charges of the court. Wesley v. The State, 37 Miss., 350. Nor has the accused a just ground to complain, if prayers of instructions are denied, when the true principles of law are embraced in those already granted. The court should charge the jury on all the points included in the written prayers, provided they are applicable to the case. When the law upon a particular subject has been fully stated to the jury, the court may well decline to go over the same ground again, at the instance of either party.

There is some confusion in the fourth instruction granted for the state. It is incumbent on the state to prove the allegations

of the indictment, or, as it is phrased in the instruction, "to make out its case." The burden of proof rests upon the prosecution throughout the trial. Where a killing has been proved, the burden of proof changes, and it is then incumbent on the defendant to show excuse or justification, &c.; and if the defendant has failed to do this, the jury may find him guilty." Such is its language. But suppose the excuse or justification arises out of the facts attending the killing brought out in the state's evidence: must the jury convict? The true proposition of law is, if there be no excuse or justification for the homicide by the accused, shown in the evidence adduced by the state, then the accused is guilty of murder, unless he has by his evidence proved excuse or justification. Generally, the circumstances immediately surrounding and attending a homicide give it complexion as criminal, excusable, or justifiable; and the proof of these fixes its character. These circumstances generally, as in this case, are developed by the testimony for the state, while establishing the main fact of the killing. It tends to mislead the jury, and involve them in confusion, by separating the single fact of death by violence at the hands of the accused from the other concomitant circumstances, and deducing from the killing done a presumption as to its character.

The use of a deadly weapon is *prima facie* evidence of malice, because a man must be taken to intend the necessary and usual consequences of his act. To shoot, or stab, or strike with a bludgeon, indicates a purpose to take life; but if the one or the other be employed to disable an adversary in the very act of making a murderous or malicious assault, then the presumption is overcome. The proof of the use in the case hypothecated of the deadly weapon, with attending circumstances, would show the excuse. Where the circumstances of the killing are known and in evidence to the jury, the deductions and inferences should be made from all the facts. When the death ensues from a gun-shot wound, or a stab, or other violent means, but no witness saw the act done, and the circumstances are unknown, and unproved by the state, here the mode of killing raises a strong presumption of malice. If the act is traced to the accused as the guilty agent, that presumption con-

tinues until he overcomes it by evidence showing excuse or justification. If he offers no explanation of the killing, if he fails to show that it was an act of necessity, done *se defendendo*, the inference of malice, from the use of a deadly weapon, remains. What we mean to affirm is, that where the mode, manner and circumstances of the killing are in evidence to the jury (although life was taken by a deadly weapon), the character of the act, whether criminal or not, and then its grade, whether murder or manslaughter, or whether excusable or not, is to be gathered from the entire body of the testimony. To use a deadly weapon justifies the inference that the accused meant to kill; but whether he was excusable on the ground of *se defendendo*, depends on the facts and circumstances with which he was environed at the time. The law esteems the life and limb and bodily safety of every human being equally; therefore every man may protect his life and limb at whatever hazard; but the danger must be present, immediate and imminent. A fear or apprehension arising from previous threats, which have been communicated, afford no excuse—none whatever, unless at the time of the killing, an effort was being made to carry the threats into execution, and a necessity, apparent or real, existed at the time to slay, in order to prevent it. We discover no substantial objection to the other instructions granted for the state.

The first instruction refused at the prayer of the accused, invited the court to charge the jury as to the weight or effect of the testimony, and was properly refused. The second instruction, while true as an abstract proposition, was inapplicable to the case. The accomplice was supported in many, if not all, of the material facts of his testimony. The female witnesses, one of them especially, proved the shooting. It was by no means a case where conviction depended on the unsupported testimony of an accomplice.

The third instruction was also properly refused. The fact that a man is permitted by law to carry arms, and the further fact that many persons do bear about on their persons deadly weapons, do not in the slightest degree diminish the responsibility for an improper use of them. We cannot, and do not

sanction the proposition, that because the evil habit to some extent prevails, of carrying deadly weapons, and the risk is thereby increased of an unlawful use of them, that therefore the law should look with more tenderness upon homicides committed by this class of persons. The excuse for the practice is, that it is done for self-protection. If, however, instead of this, they are used for offense and upon persons unarmed, there is no reason grounded either in correct sentiment or in the principles of law, which would demand any relaxation or loosening of the criminal jurisprudence. It was always the doctrine of the law, that if a man arms himself for the fight, and draws his adversary on to the conflict, and slays him, it is murder. In what better light does he stand who is habitually armed, and upon a sudden quarrel and fight with an unarmed adversary, slays him; that is, if he push the quarrel on, and invite the blow. A prisoner arming as a preparation for a rencontre, evinces deliberation, and is proof of express malice. But we repudiate, with the circuit court, the idea contained in this instruction, "that if an armed person (not with reference to a controversy with deceased) became involved in a difficulty with deceased, and took his life with such weapon, '*that malice cannot be inferred simply from the fact of the use of such weapon.*'" This would give very large immunity to those who habitually go armed; and would apply a different measure of responsibility for the results and consequences of these "difficulties," from those who go unarmed. We had said that the law infers from the use of a deadly weapon, an intent to kill, and if the facts and circumstances do not show excuse or justification, it is criminal and malicious; if the weapon be drawn from its accustomed resting-place in the belt or scabbard, it in no degree mitigates or relieves the act; the question still remains, Was the homicide necessary—was there excuse or justification?

The court had already fully instructed the jury as to the character of doubt which will warrant an acquittal, and might properly decline the prayer of the defendant on that subject, as presenting nothing additional to guide the jury. The same remark applies to the next succeeding instruction, which had been fully explained to the jury, and in much ampler terms.

The next ten charges asked contain correct principles, and ought to have been given. The principles in the last three charges refused, are embodied in others which were given, and it was not error to decline to repeat them.

For the errors herein indicated, the judgment is reversed, and cause remanded for a *venire facias*.