## JOHN F. GAVIGAN v. THE STATE.

1. CRIMINAL LAW. *Practice. Objections to special venire.*
   Where, on the trial of an indictment for murder, the special *venire* is ordered without having been applied for, either by the district attorney or by the defendant, the writ should be quashed on the motion of the latter, if made at the proper time; but it is too late, after the jury has been impaneled and sworn, to object to such irregularity, for it is cured then by section 2848 of the Code of 1871, which makes all laws relating to the mode of selecting, drawing, summoning, and impaneling all juries directory merely, and makes all juries legal "after they have been impaneled and sworn," though drawn, summoned, and impaneled in an informal and irregular mode.

2. SAME. *Evidence. Diagram, how proved.*
   On a trial for homicide, where a diagram of the locality of the killing, introduced in evidence on the part of the state, is used by the witnesses on both sides, and treated by them as a true delineation of the locality, and of the positions of persons and objects, it will be regarded as sufficiently proven, though its introduction was not preceded by the usual preliminary proof of its correctness; and if the defendant took no exception at the time to its introduction and use, he is presumed to have acquiesced therein.

3. SAME. *New trial. Application, on newly-discovered evidence.*
   An application for a new trial in a case of homicide, on the ground of newly-discovered evidence, is addressed to the sound discretion of the court, and its action in refusing to grant the motion will not be reversed unless there has been an abuse of discretion which this court can see was injurious to the accused.

4. SAME. *New trial. What showing required on application for.*
   Where a defendant convicted of murder makes a motion for a new trial, on the ground of newly-discovered evidence, he is required to embody the facts he expects to prove in his own affidavit, supported by the affidavit of the new witness, if it be practicable to produce it, so that the court may see that the motion is made in good faith, and that the testimony is material and not merely cumulative; and if the affidavit of the witness cannot be procured, the defendant must set forth the reason of his failure to produce it.

ERROR to the Circuit Court of Warren County.

Hon. UPTON M. YOUNG, Judge.

John F. Gavigan, the plaintiff in error, was convicted of the murder of A. R. Murphy, and the penalty fixed by the jury at imprisonment in the penitentiary for life. He made a motion for a new trial, which being overruled, he sued out a writ of error. The original transcript of the record sent up

to this court did not show the organization of the court in which the plaintiff in error was convicted; but, upon suggestion of a diminution in the record, the court caused a *certiorari* to issue for a full and perfect transcript, and in return thereto the circuit clerk sent up that part of the record showing the organization of the court. The other facts, as well as the evidence and the assignments of error, appear in the opinion of the court.

*Fitzgerald & Shelby* and *Brien & Spears,* for the plaintiff in error.

It was erroneous for the court, without the application or demand of either the plaintiff in error or district attorney, of its own motion to have ordered a special *venire* of twenty-five names from which to select a jury to try the accused. This is manifestly such an error on the part of the court below as entitles the plaintiff in error to a reversal of the judgment. That the action of the court in this was wholly unauthorized, we need but to refer the court to section 2759, Revised Code of 1871. It is there provided that the court shall order a special *venire* only when demanded either by the district attorney on behalf of the state, or by the defendant; and when the district attorney fails to demand a special *venire,* it then leaves it to the discretion of the defendant, and it is simply a right that he has to have one drawn for the purpose of selecting a jury to try his case. And we submit that, in the absence of such demand on the part of either the district attorney or the defendant, the court has no right to force it upon him.

2. The next assignment of error is that the diagram contained in the record was, according to the record, used in evidence during the progress of the trial, without any sort of proof first being introduced as to its correctness. It pretends to be a diagram of the locality at which the homicide occurred; and, if it be an incorrect and false one, it is possible, at least, that its introduction before the jury, in evidence, might greatly have misled them, and very materially influenced their decision. The great importance of having a correct diagram of the

locality of the scene of the homicide in evidence, after one was introduced, will be quite manifest when a reference is made to the evidence in this case, and when considered as a whole. We submit that its introduction in evidence in this manner was erroneous, upon the old, familiar principles of evidence as to the necessity of the proof of the identity of written instruments before their introduction in evidence. *Carmicheal* v. *School Trustees*, 3 How. 84.

By a reference to the testimony it will be seen that the description before the jury of the locality of the scene of the homicide, and particularly the description given them of the " Vicksburg boarding-house," must have had great influence upon their minds in determining the degree of credibility that some of the most important witnesses for the defense were entitled to, and especially the witness Frank G. Pierce. And this we conceive to be one of the most important features of this case ; for a perusal of the evidence in this cause will surely force the conclusion upon the reader that the only conscientious way that the jury could have arrived at their verdict of guilty .was by disbelieving *in toto* the testimony of the most important, and nearly all, of the witnesses for the defendant, and receiving as true every word that fell from the lips of the witnesses for the state.

3. Another assignment of error is that the court erred in overruling the motion for a new trial. We submit, first, that the motion ought to have been sustained, because the affidavit of Samuel Jones, filed in support of the motion, showed that the defendant was not tried by such a fair and impartial jury as was guaranteed to him by the Constitution. The juror Barefield, whom we will insist was disqualified, upon his *voire dire* stated that he knew nothing of the facts of the case, and had neither formed nor expressed an opinion as to the guilt or innocence of the accused. But after the trial and conviction of the plaintiff in error, in answer to this question, propounded by. Jones, " How is it that you were on the jury that tried Gavigan, when you knew all the facts of the case

from talking with Wash. Ferguson, who was one of the jurors when he was first tried?'' replied, '' Because the lawyers never asked me.'' We submit that the very reply is an indirect admission on his part that he was familiar with the facts of the case. And he having learned them from so reliable a source, and having had so good an opportunity — that is, by conversing with Ferguson, one of the jurors before whom the case was first tried — for learning the true facts, it is but natural that he should have formed some opinion as to the defendant's guilt, and an opinion too unfavorable to him ; for the testimony, or the affidavits, rather, show that Ferguson was in favor of the defendant's conviction when the jury disagreed and were discharged. And if this be true, the judgment should be reversed, and the sacred constitutional right of trial by a fair and impartial jury should be granted to him. See *Cody* v. *The State*, 3 How. 27 ; *Sam's Case*, 13 Smed. & M. 189.

The court also ought to have granted a new trial because of newly-discovered evidence.

It is apparent from the evidence in this case that the jury disregarded entirely, or received as untrue, the evidence of Pierce, Jackson, Miller, Mary Seals, and Maratti, or they could not possibly have conscientiously returned a verdict of guilty. That being true, it is at least possible, if not probable, that if the defendant could have the advantage of this newly-discovered testimony mentioned in the affidavit of himself and Joel O. Stevens, filed in support of his motion to set aside the verdict and grant a new trial, corroborating materially, as it does, all of the other important witnesses for the defense, the testimony of these witnesses would be received as true, and a different and favorable result obtained.

In this particular case the objection that the newly-discovered evidence alluded to is cumulative is the strongest and most forcible argument in favor of giving the plaintiff in error the benefit of it.

*W. R. Spears* and *R. H. Shelby*, on the same side, argued the case orally.

*T. C. Catchings*, Attorney-General, for the State.

1. It is assigned for error that the special *venire* of twenty-five men was drawn upon the order of the court, without the request of either the district attorney or the defendant. The record does not show, it is true, that either party demanded a *venire*, but that is no error which can be complained of. If the state had desired a special *venire*, it would have been the duty of the court to order one, and that without consulting the defendant, and even against his wishes. The statute on the subject is as much for the benefit of the state as the prisoner. No objection appears to have been made to the drawing of the *venire* by anybody. Inasmuch as the district attorney could have demanded a *venire*, he had the right to consent to the drawing ordered by the court, and, as he made no objection, his consent will be presumed. The action of the court being thus agreed to by the district attorney, the case stands just as if the court had ordered the special *venire* upon the demand of the district attorney. It is a sufficient answer, however, to say that the record shows that not one of the special *venire* was summoned, or served on the jury, but that it was made up just exactly in the mode in which it would have been made up if no *venire* had been ordered. The law for the impaneling the jury is only directory. Code, sec. 2843.

2. It is assigned for error that the court erred in permitting the diagram to be used in evidence by the state, without any proof as to its correctness or identity.

If the proposition advanced by this assignment were true, it would amount to nothing, inasmuch as there is nothing in the diagram which could have prejudiced the defendant, or influenced the jury; but the proposition is not supported by the record. While it does not appear that any witness was, in terms, called to prove the correctness of the diagram, it does appear, from the bill of exceptions, that it was used by all of the witnesses in fixing the location of the parties, etc., and no objection appears to have been made to its use. This is

sufficient to answer the objection, if it was necessary to make answer to it-at all.

3. The next assignment is that the court erred in refusing a new trial.

It is claimed that one of the jurors, Thomas Barefield, knew all the facts and had expressed an opinion, but denied it when on his *voire dire*. In support of this the affidavit of one J. C. Jones was filed, which, if true, might have justified the objection; but when examined in open court it turned out that he was only a " lightning swearer " on paper. The sum of it all was that Barefield had said that a man named Ferguson, who was on the jury which first tried Gavigan, had said that one of the jurors on that trial, named Ieter, was such a fool that he was afraid to walk around the court-house, lest a photographer across the street might take his picture.

As to the newly-discovered evidence, I will say that the man McDonald would, if present, have testified only to what the witness Frank Maratti did testify to. His testimony would simply have been cumulative, and the jury would, doubtless, have set him down as a first-class liar, as they evidently did Maratti. It is not reasonable to suppose that the testimony of the man McDonald could change the result, or would bring about a different verdict, if a new trial was granted.

*T. C. Catchings*, Attorney-General, argued the case orally.

*R. V. Booth*, District Attorney, on the same side, filed an elaborate brief on the evidence and facts of the case, and also made substantially the same points as are contained in the brief of the attorney-general, above.

SIMRALL, C. J., delivered the opinion of the court.

The first error assigned, impugning the organization of the court in which the plaintiff in error was tried and convicted, is cured by the return to the *certiorari*.

The second error is that the special *venire* was not ordered

on the application of the district attorney, or of the accused. For that irregularity the writ would have been quashed, on the motion of the defendant.    No demand was made for another *venire;* but the defendant went to trial without any · question raised as to the source whence the jury was taken, or any exception as to the manner in which the panel was made, or to its individual members.    The irregularity is . cured or waived by force of the statute (Code, sec. 2843) which makes all laws relating to the mode of selecting, drawing, summoning, and impaneling all juries directory merely, and makes all juries legal, though drawn, summoned, and impaneled in an informal and irregular mode, " after they have been impaneled and sworn."

It is too late, after the jury has been impaneled and sworn, to make objection to the *venire facias,* to the panel, or the manner in which it was constituted.    If not made earlier, it will be construed as a waiver.    *Head's Case,* 44 Miss. 731 ; *Darrah's Case,* 44 Miss. 795.

It is alleged that the diagram of the locality and vicinage of the homicide was not sufficiently proved.    There is an absence of the usual preliminary evidence that it is a correct delineation.    But it was used in evidence on the trial, and was referred to by the witnesses on both sides, to show the relations of objects and persons explanatory of their testimony.    The witnesses speak of it as a true description of the position of objects and persons, and allude to it for that purpose.

It was sufficiently proved — and, if it had not been, its use on the trial would be presumed to have been acquiesced in by defendant, since he made *then* no exception to it.

Did the accused, by his affidavits, bring himself within the rules which govern motions for new trials on the ground of . newly-discovered testimony?

It has been repeatedly ruled in this state that applications are addressed to the sound discretion of the court.    A reversal will not be made for that reason unless there has been an abuse of discretion which the court can see was injurious to

the accused. The early case of Noe, 4 How. 331, seems to deny a review in the appellate court altogether. The subsequent cases relax the rule. For the extent of it see *Ogle's Case*, 33 Miss. 383; *McDaniel's Case*, 8 Smed. & M. 401, 443; *Jones' Case*, MS. opinion.

The testimony should not be merely cumulative; and the court ought to be satisfied that the application is made in good faith, and, if practicable, that the absent witness will prove the matters stated in the affidavit of the accused. To meet the requirement imposed on the applicant, he must embody the facts he expects to prove in his own affidavit, supported by the affidavit of the absent witness, if it be practicable to produce it, so that the court may see that the motion is made in good faith, and that the testimony is material. The defendant states that the discovery of this witness has been made since the trial, and that he resides in Warren County (the place of the trial). But he fails to produce an affidavit from him, or offer any explanation why he does not. He did not request a postponement of a hearing, on the motion to give time to get the affidavit, or ask, if the time were too short, for a continuance of the motion to the next term.

The affidavit of Stevens that he had heard the absent witness make substantially the same statement is too remote and uncertain. If there had been an inability to produce the affidavit of the witness, and that had been shown, Stevens' sworn statement would have been of some value, if the court were satisfied that justice required the presence of the witness. These principles have been frequently announced in this court. *Bulon* v. *Linton's Heirs*, 2 How. 891; *Hare* v. *Sproul*, 2 How. 772; *Wright* v. *Alexander*, 11 Smed. & M. 411; *Garnett* v. *Kirkman*, 41 Miss. 9; *Long's Case*, 52 Miss. 30. In *Hinds* v. *Terry*, Walk. 80, it was said: The truth of the suggestion of newly-discovered evidence must be established. The showing on this ground was not sufficient.

Ought the verdict to have been set aside because of the partiality and bias of the juror Barefield? This cause rests on

the affidavits of the bailiff, Jones, and of A. Shultz, and the oral examination of Jones at the hearing. The substance of Jones' statement is that he heard Ferguson, who was a member of the first jury that tried this case, tell Barefield many of the *facts of the case*, and how the jurors stood on that trial, and the names of those who caused the jury to hang. To this Barefield replied that such jurors were fools, and ought to have agreed with the others. After the trial the affiant asked Barefield how he "became a juror when he knew so much about the facts in the case." Barefield replied, because the lawyers did not ask him if he knew anything about the case at all.

Shultz stated that Barefield told him that it was his (Barefield's) invariable custom, when he heard of a killing in Vicksburg, to go there and learn all about it. Further, he states that Barefield was, from the beginning, in favor of conviction. The court had the bailiff, Jones, sworn, and examined him as to the matters in his affidavit. He said that his affidavit was correct substantially, with the following corrections, viz. : "Barefield did tell him that Ferguson had told him (Barefield) that a man on the jury was such a d—d fool that he would not walk around the court-house, because he was afraid a photographer across the street would take his picture." Barefield never said anything about the reason why the jury could not agree, nor did he express any opinion whether Gavigan was guilty or not, nor did he say anything about the case. These corrections and retractions by the bailiff about annul his affidavit, and leave him in not a favorable light as an officer of the court.

It is certified to us, in the bill of exceptions, that Barefield on his *voire dire* was fully examined by the district attorney as to whether he knew anything about the facts, and had formed and expressed an opinion ; to all which questions he answered no. He was then tendered by the state to the accused, when one of his counsel only asked him if he was a son of Hugh Barefield, and, upon his answering yes, he was accepted.

This effort to impeach the verdict, on the ground of the partiality and bias of this juror, was not sustained.

Ought the verdict to have been set aside because not supported by the evidence, or as against the evidence?

The defense made by the plaintiff in error was that he committed the homicide in necessary self-defense. The testimony abundantly shows that, at the time the accused fired the first shot, he was in no *real* danger of losing his life, or of suffering any bodily harm. When the second shot was fired, the deceased was in the act of turning around to make his escape; when the third shot was fired, he had fled across the street and was in the act of entering Mrs. McCune's house.

But was he in *apparent* danger? The theory of the defense was that when Gavigan accosted Murphy, he made a response which indicated anger and defiance; and that the words were accompanied with a movement as if he was attempting to draw a pistol; and that the firing by Gavigan was anticipating a shot from his adversary. In such circumstances, he was in great and imminent danger of losing his life or receiving some grievous bodily hurt, and was, therefore, excusable for prompt and quick action for his own safety. But the witnesses who deposed to the angry words and threatening movement of Murphy are in conflict with other witnesses, who represent him as being taken by surprise, and unprepared for the deadly assault made upon him.

The eye-witnesses examined for the state give this account of the homicide: Joseph Billetts, on the morning of the killing, was taking a sewing-machine to the Vicksburg boarding-house, to be repaired by Pierce, the bar-keeper; the machine was on a dray driven by James Couglin; Billetts was walking a little ahead. These parties approached the Vicksburg boarding-house from the north — down Levee Street. The Vicksburg boarding-house is on the south-west corner, at the intersection of Levee and South Streets. The narrative is continued in the words of the witness:

" I [Billetts] had just crossed South Street at the Vicksburg boarding-house, and had one foot on the sidewalk, and saw defendant standing near the corner, with the pistol in his hand; heard him [the defendant] say, 'I have got you now,' and something else I did not understand; looked up and saw Murphy coming diagonally across Levee Street towards the Vicksburg boarding-house [at or near spot E on diagram]; Murphy was walking with both hands down by his side, and his eyes looking down to the ground. Immediately after this speaking by defendant he [the defendant] fired one shot, and immediately thereafter a second shot. Murphy, after the firing of the second shot, turned and ran towards Mrs. McCune's. The defendant jumped after him two or three steps, and fired the third shot. Murphy continued to run, and defendant continued to pursue him, and just as Murphy was going into Mrs. McCune's door, defendant snapped his pistol at him. * * * When the first shot was fired, I was in four feet of Gavigan. At that time Couglin was at the north-west corner of South and Levee Streets."

The witness Couglin describes the relative position of himself and Billetts when the shots were fired, as stated by Billetts, whilst the two were in that position (quoting his language): " I saw Gavigan, and heard him say, 'I have you now, you son of a bitch.' Murphy was crossing from on the opposite side of Levee Street, on the stepping-stones leading to the Vicksburg boarding-house. Murphy, the deceased, did not speak — he did not have time to speak; he had nothing in his hands. Immediately on speaking the words above mentioned, Gavigan began to fire. * * * Murphy was turning when the second shot was fired." It is not important to pursue his testimony further.

The witnesses for the defense who speak of the killing state these circumstances: Maratti was going down street; saw Gavigan standing on the corner of Levee and South Streets, with his back against the jamb of the door of the board-

ing-house near the corner, on South Street; Murphy was coming across Levee Street ; when he got within five or six feet of Gavigan, *heard some words pass between them about settlement;* don't know what was said, but heard Murphy say, " I will give it to you now," and threw his right hand behind him, as if to draw a pistol; was in front of Murphy, and immediately ran out of the way ; was a few feet to left of Gavigan. As Murphy wheeled to run, saw him drop something — could not say what it was — which was picked up by a man, whether white or black, could not tell; did not see Billetts on the dray, nor any person about there. On cross-examination, this witness said he did not say anything about a " settlement," but did say that some words passed, but did not hear what they were.

.There are several curious passages in the testimony of this witness. He does not say *how,* or precisely when, he came to the scene. He " walked *down* street," but whether Levee or South Street is left to conjecture. Whether coming from the north or the south, east or west, was " down " street, we must also guess. If he came on Levee Street, he walked either in a northern or southern direction. If *south* was " down " street, and he came from that direction, he would not have seen Gavigan in the South-street door of the Vicksburg boarding-house until he .had passed the entire *Levee-street front* of the house, and had got beyond it. If he came " down " that street from the north, then he traversed the same ground as Billetts, and Couglin and the dray — and a little in advance ; for, when these parties got to the place — Billetts to the pavement and Couglin to the corner in front of Henry's store — the firing began. If he was in " front " of Murphy, as he says, when Murphy made the effort to draw his pistol (as he thought), he got there by walking at right angles, or in a line perpendicular to the direction of Murphy's line of walking, as he was crossing the street, and must have got between Murphy and Gavigan

just at the moment Murphy made his hostile demonstrations. At that precise juncture of time there was not more than five or six feet between Murphy and Gavigan.

The witness was in close proximity to danger, and we are not surprised that he quickly ran or jumped to one side, and that was on the left; but it is very strange that neither in walking to the spot from which he so quickly returned he did not pass the dray, nor its driver, nor Billetts, nor did he then, or at any other time, see them, or either of them, or the dray. This is still more remarkable when he must, either just before or at the time of the shooting, have been in arms-length of Billetts, if Billetts was within four feet of Gavigan, and to his left, when he fired the first shot. But he saw Murphy drop something on the ground which was picked up by a man, white or black, and yet he is the only witness who saw that fact, or who speaks of a man not mentioned by any other person, and of whom nothing has since been seen or heard. If it was a pistol or knife that was dropped, it is hardly possible that so significant a fact was not seen by any person else. The witness also admits that when examined before the mayor, the next day after the homicide, he did not report the words used by Gavigan to Murphy, as on this trial. He said nothing about the " settlement."

If this witness came down " South " Street, he must have crossed Levee Street either in front of Murphy, when his back would be to him, or in his rear, when he would be in no danger from Murphy's pistol.

The witness Pierce, who was a bar-keeper at the Vicksburg boarding-house, shortly after breakfast saw Gavigan come out of the privy with a pistol in his hand, who asked him ( witness ) " whose pistol it was," saying he had found it in the privy. On being answered that it belonged to Captain Miller, he said he would take it out to him and make him stand the drinks. The parties separated; Pierce went into his bar-room, and Gavigan passed through an old house, by the door on South Street, into the street. Pierce went to the cooler on his

counter to empty water which he had brought from the cistern
in the yard, " and [in his own words] looked out of the win-
dow opposite the cooler, and saw deceased coming from the
direction of Mrs. McCune's house.   *   *   *   I walked to the
north-east door for the purpose of speaking to Murphy [about
a matter which he mentioned], and just as I got there I looked
to my left and *saw Gavigan* walking up the pavement on South
Street, near the north-east corner of the Vicksburg House.
When Gavigan and Murphy got within a few feet of each other,
I heard Gavigan say, ' Mr. Murphy, I want you to tell me
something about my brother Joe's business,' or ' Give me a
settlement of brother Joe's business.'   Murphy then immedi-
ately stepped back and threw his right hand behind him, and
said, ' I will give it to you now,' or ' I will show it to you
now.'   *   *   *   Gavigan replied, ' You are too slow, Mur-
phy,' and fired."

It is important to note that so soon as Pierce got to the
bar-room with the bucket of water, he saw Murphy crossing
Levee Street, and went immediately to the door and saw Gavi-
gan to his left, running up South Street; and when they got
within five or six feet, the first shot was fired.  Just before that,
Gavigan and Pierce had parted in the back-yard.  Gavigan
started to go through the old house to South Street.  Captain
Miller gives this account:  He was the owner of the pistol
which Gavigan found in the privy.  He says that he was sitting
in a chair on the South-street pavement, between the door and
the corner of the house, and, hearing a voice behind him, " I
want you to give me a settlement of my brother's business,"
looked and saw Murphy coming across the street; saw Mur-
phy's movement with his hand, and, from fear of danger,
jumped up and ran into the house.  When on the pavement,
was talking with a man by the name of Burke.  " It was *ten
or fifteen minutes* after Gavigan walked up behind him before
the shooting began."  Can't tell how long Gavigan stood be-
hind him before the shooting began, but it was ten or fifteen
minutes, a little more or less.

From the remark made by Gavigan to Pierce in the yard, just as they separated, he intended to carry the pistol and give it to Miller; yet he was near Miller on the pavement ten or fifteen minutes, and made to him no allusion about the pistol. It is certain that Pierce saw Murphy so soon as he got to his bar-room. It would take but a very short space of time to walk from the yard into the bar-room, but so soon as he got there he saw Murphy crossing the street. He went at once to the door to meet him, and saw Gavigan coming up South Street, and immediately accost Murphy. The just inference is that it took Gavigan as long to get through the old house, out onto South Street, and walk up to the corner of the boarding-house, as it did Pierce to walk into the bar-room, deposit the water-vessel, and then go to the street door, which could not have been more than two or three minutes, if as much. And if that be so, Gavigan could not have stood ten or fifteen minutes behind Pierce before he spoke to Murphy and fired the first shot. Pierce makes no mention of seeing Miller.

Andrew Jackson, another witness for the defense, saw the shooting, and gave substantially the same account of the homicide as Pierce and Miller. It was proved that this witness swore, on the investigation before the mayor — the same day of the killing, or the next day — that Gavigan showed him, upstairs in the boarding-house, the pistol with which he, a few hours afterwards, killed Murphy. On this trial he denied, when first questioned, that he had so sworn; afterwards he said that, if he had so sworn, he did not intend to do so, or misunderstood the question.

Mary Seals, a colored witness, testified for the defendant on the first trial; she died before the last trial. Her testimony on the first trial was proved to be this: She was standing on South Street, about 100 yards distant from the parties, when the shooting occurred; saw Murphy stop and put his hand behind him; don't know whether he kept it there or not; told Mr. Lackman and a young fellow about a week ago; did not know who had her summoned.

The theory of the defense was that Gavigan casually had Miller's pistol in his hand, and, apprehending from the actions of Murphy that he was about to shoot, used it. That he anticipated not so much as an altercation of words, and, therefore, had no occasion to arm himself, much less to have a pistol in his hands when he accosted him.

It would naturally have the effect of disparaging Johnson's testimony, if he swore before the mayor, the day after the homicide, when occurrences were new and fresh, that Gavigan, in an upper room of the boarding-house, showed him the pistol with which, in an hour or two afterwards, he killed Murphy, and swore on the trial what was the equivalent of his getting the pistol in the privy. The witness Maratti stated the words used by Gavigan to Murphy different from his statement on the trial, and offered no explanation.

The disagreement between Pierce and Miller, as to the movements of Gavigan between the time he left the yard and spoke to Murphy, must have arrested the attention of the jury.

These witnesses represent the manner and tone of voice of Gavigan as mild and unexcited, and the conduct of Murphy as that of a man who was expecting a hostile rencounter with Gavigan, and *prepared for it.* Yet there cannot be a reasonable doubt that Murphy was unarmed. His person was examined immediately after he was shot, and no pistol or other weapon was found upon him. The single witness who saw Murphy drop something at the first fire must be *mistaken.* The man who stooped down and picked up that something did the thing, if done at all, in the presence of too many eyes directed to the spot not to have been observed by somebody. And it needs more explanation than is satisfactorily supplied in this record, why Murphy, who was unarmed, should, when accosted by Gavigan, assume an attitude and movement to draw a weapon, when he knew he had none.

These criticisms, obviously suggested by a perusal of the bill of exceptions, presented themselves to the minds of the jury, and the impressions made were in no small degree contributed

to by the manner and deportment of the witnesses. It is a most valuable aid to a safe and satisfactory conclusion to see and hear the witnesses. It is not possible to translate, in a bill of exceptions, those almost indefinable tokens, in the tone and manner of testifying, which beget confidence in the deponent or excite a suspicion that he is exaggerating, suppressing, or fabricating in whole or part the narrative. When the question is presented to an appellate court of conflict and credibility, it considers it at great disadvantage, and should pause and hesitate before substituting its view of the testimony in place of the finding of the jury.

The judgment is affirmed.