# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-01585-SCT

*ANDY NICHOLAS BROWN a/k/a ANDY BROWN*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 08/15/2013 |
| TRIAL JUDGE: | HON. ROBERT WILLIAM ELLIOTT |
| TRIAL COURT ATTORNEYS: | EDWARD LANCASTER |
| | JERRY L. STALLINGS |
| | HONEY USSERY |
| COURT FROM WHICH APPEALED: | CALHOUN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: MICHAEL E. ROBINSON |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/11/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., PIERCE AND KING, JJ.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     Andy Brown was indicted and convicted under Mississippi Code Section 97-3-19(1)(a) for the death of Earlie D. Balford, after Brown stabbed Balford eighteen times with Balford's screwdriver.  On appeal, Brown argues he was provided ineffective assistance of counsel and that the trial court erred by excluding Brown's jury instructions, by denying Brown's motion to quash his indictment, by denying Brown's motion for directed verdict,

by denying Brown's motion for a new trial, and by excluding evidence Brown sought to introduce from a psychiatric evaluation. Brown further contends that these errors resulted in cumulative error, denying Brown a fair trial in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution. Brown appeals to this Court seeking reversal of his conviction and a new trial. We find no error and affirm Brown's conviction.

**FACTS**

¶2. Balford, a sixty-seven-year-old man, and Brown, a twenty-eight-year-old college student, had been neighbors for years. Brown and his brother lived with their mother, Annie D. Brown, in her house atop a small hill in Pittsboro, Mississippi. Balford lived in one of a few small mobile homes near the Brown family home.

¶3. To make a living, Balford solicited odd jobs from local businesses, churches, and people around Grenada. At the time of Balford's death, Brown was three credits shy of completing his associate degree at a local community college. Brown's mother normally cooked dinner for herself and her two sons each night, while all three worked on their college homework. When Annie Brown cooked for her family, she also set aside a dinner portion for Balford that either Andy or her other son delivered to Balford nightly.

¶4. On the morning of April 18, 2012, Annie Brown asked Andy to walk to Balford's home to borrow a jumper cable to restart her lawnmower's dead battery. Brown did so, and Balford went back to the Browns' house to help start the mower. Brown testified that, after successfully jumping the battery, Balford demanded money for his help. Brown maintained that he told Balford that he did not have money and would not give him money in any event,

2

but that Balford would receive the nightly dinner he always had. Brown testified that Balford next asked Brown to engage in some sexual activity, and that Brown refused.[1] Brown subsequently left.

¶5. Later that evening, Annie Brown sent Andy to Balford's trailer with the dinner she had set aside for him. Brown claimed that when he knocked on Balford's door, Balford lunged at him with a screwdriver. Brown testified that he then dropped the plate of food, and it shattered on the ground outside Balford's trailer. Brown reached for Balford's arm to stop Balford from stabbing him with the screwdriver. Brown testified that Balford next began to strangle Brown, pulling Brown into Balford's five-foot-by-ten-foot trailer. Immediately next to the door inside Balford's trailer, Balford kept a small upholstered couch. Upon being pulled into the trailer, Brown stated that Balford fell backward onto the couch while strangling Brown. According to Brown, Brown was now on top of Balford, and Brown struggled for air and begged for his life. Brown testified he reached for an object with which to defend himself and found the screwdriver that Balford had wielded earlier. Brown contended that as he fought for air he stabbed Balford with the available screwdriver so that Balford would release his stranglehold, and that, when Balford did release his hold, he was no longer moving or breathing.

¶6. Brown ran back to his mother's house and told her to call the police because he and Balford "got into it." Annie Brown wanted to call Balford or check on him, at which point

---

[1]Brown originally recounted these events to Dr. Criss Lott in a psychiatric evaluation. Brown did not testify to this interaction with Balford on direct examination, but the State elicited this testimony during cross-examination, over Brown's objection.

Brown said "Mama, he's not going to answer." At her son's direction, Annie Brown called 911 emergency services at approximately 7:31 p.m. A 911 dispatcher directed police to Balford's residence eight minutes later. Brown waited on his mother's stoop for the police to arrest him.

¶7. Police took Brown to the Calhoun County Sheriff's Office. At 9:20 p.m., Brown signed a document advising him of his rights and simultaneously waiving those rights. At the police station, Annie Brown wrote a statement that she had called 911 after Brown had told her he had fought with Balford and that she had checked on Balford to find him lying over the couch in Balford's trailer. Another statement was written at 10:00 p.m. by Officer Plunk, who overheard Brown tell Officer Poynor that he killed Balford because "he talked too much." Officer Poynor did not write a statement. Poynor testified he received another call shortly after Brown said he had killed Balford because he talked too much, and the interrogation was suspended until Poynor returned. At that point, Poynor claimed Brown refused to speak any further.

¶8. On October 22, 2012, Brown was indicted by a Calhoun County grand jury. A grand jury indicted Brown under Section 97-3-19(1)(a), " . . . That [Brown] . . . did unlawfully, willfully, feloniously and without authority of law and with the deliberate design to effect the death of Earlie B. Balford, kill and murder the said Earlie B. Balford, a human being, by stabbing said Earlie B. Balford with a screw driver . . ." Brown pleaded "not guilty."

¶9. On January 25, 2013, Brown, through counsel, filed a joint motion with the State for psychiatric evaluation to determine competency for trial. On January 30, 2013, the trial court

4

granted an order to that effect and allowed Brown to be evaluated by the Mississippi State Hospital staff at Whitfield. The agreed order waived Brown's medical privilege with the evaluation doctor. On February 15, 2013, Dr. Criss Lott performed the psychological evaluation on Brown.[2]

¶10.    On August 13, 2013, Lott testified at a pretrial hearing that he had found Brown to be a rational person capable of assisting his attorney in his defense at trial. Dr. Lott further testified that he had examined the defendant a second time that morning and that his findings had not changed. On cross-examination, Dr. Lott testified that he was of the opinion that defendant was "very polite and cooperative." When asked whether, based upon his professional psychological evaluation of the defendant, Dr. Lott could testify as to the defendant's tendency for truthfulness, Dr. Lott stated that "A tendency for truthfulness, all I can say is it was my impression he was being forthright; and I did not get the sense that he was in any way trying to – we call it simulate – trying to fake good or bad." Based upon this testimony, the trial court then found Brown competent to stand trial.

¶11.    Brown filed a motion with the trial court to allow Dr. Lott to testify before the jury at trial on Brown's propensity for truthfulness. The defense called Dr. Lott as a witness for pretrial proceedings. Dr. Lott again testified that, during the clinical interview, Brown had appeared to be truthful. Dr. Lott also testified that Brown was not attempting to exaggerate or distort the facts. The State objected to Dr. Lott's testimony on Brown's propensity for truthfulness. The State argued, "We think that's so out of bounds that I don't even know

_____

[2]Dr. Lott's report was not included in the appellate record.

how to argue it, Judge, except its not permissible under the rules of evidence." The trial court agreed with the State and did not allow Dr. Lott to testify, finding "First of all, we don't know whether Mr. Brown is going to testify or not, second Dr. Lott doesn't know what he's going to testify to until he's heard him; and third, I believe the only way he could testify is to his reputation for truthfulness or veracity. I don't think that's where we're going on this, and I just don't think this type of testimony would be relevant or admissible."

¶12.    Nine witnesses testified for the State of Mississippi during its case-in-chief, including Dr. Mark LeVaughn, a forensic pathologist and the Chief Medical Examiner for the State of Mississippi. Dr. LeVaughn testified that he counted eighteen puncture wounds during Balford's autopsy and that "Mr. Balford died as a result of multiple stab wounds." Dr. LeVaughn said that three wounds in particular, punctures to Balford's neck, lung, and liver, were fatal.

¶13.    Dawn Cannon, the 911 operator, next testified that she had received a call from Annie Brown, who stated " . . . that her son, Andy Brown, had just stabbed their neighbor in the chest with a screwdriver."

¶14.    Kenneth White, an officer with the Calhoun County Sheriff's Office, testified he was dispatched to the scene, where he observed Balford lying motionless on a couch in a laid-back position.

¶15.    Keith Thacker, a part-time employee with the Calhoun County Sherriff's Office, next testified that he was the first to arrive on the scene. Upon arriving, he observed the defendant,

6

his brother, and his mother standing in their driveway. Thacker testified Brown said "he did it" and "he was responsible."

¶16.　Greg Pollan, Calhoun County sheriff, testified that he photographed both the scene and the victim. Pollan observed and photographed objects on the floor but observed no injuries on Brown later that night at the station house.

¶17.　Dean Poynor, chief deputy, testified that he interviewed Brown at the station, where Brown gave him a voluntary statement after signing a waiver of rights. Poyner testified, "I went to talking to Andy Brown. I looked at him during the interview and I asked him why he done it. He looked me right in the eyes and said, 'He talks too much.'"

¶18.　Earlie Balford, Jr., Balford's son, testified that he had received a handwritten letter signed by Brown and delivered by Balford Jr.'s neighbor and Brown's fellow inmate, Ty Mitchell. The letter was introduced into evidence later in the trial. In its entirety, the letter read,

> Dear Eral Jr.,
>
> 　　I know their are not any words that I can say or explain to you and your family that will show you how truly sorry, I am for murdering your father! He was a good man with a good heart and spirt. If there is anything in this world that I could do for you and your family please don't hesited to ask me. I pray to the good Lord above that Eral is watching from above over you and your family. Please forgive me for the mistake that I have made. May the Lord contine to Bless you and your family!
>
> 　　　　Sincely,
> 　　　　Andy Brown.

¶19.　Julie Cruthirds, Balford's sister, testified that her brother had told her that he wanted to move away from the hill because it was becoming too violent. Balford told Cruthirds that

7

". . . sometimes [the neighborhood boys] get to arguing. They want me to decide who is right; and when I decide with one, the other side will get angry." Cruthirds did not identify which people Balford feared in particular.

¶20.    Ty Mitchell, a twenty-three-year-old neighbor and former county inmate who talked with Brown while he was confined in the jail, testified that Brown had told him he killed a man and that Brown gave him a letter to give to "[t]he dude's daddy he killed."

¶21.    At the close of the State's case-in-chief, Brown moved for a directed verdict on the ground that the State had failed to prove the element of deliberate design to effect the death of a person.  Brown's counsel argued that the State did not properly establish chain of custody for the screwdriver as the weapon effectuating Balford's death.[3] The trial judge overruled Brown's motion for a directed verdict, stating, "Considering the evidence most favorable to the State and all reasonable inferences that can be drawn therefrom, the Court's of the opinion that the evidence is sufficient for the jury to find that the essential elements of the crime of murder have been proven beyond a reasonable doubt, and the motion is denied."

¶22.    The defense then presented two witnesses, Annie Brown and Andy Brown, testifying on his own behalf.  Annie Brown testified that, on the night Balford was killed, Brown went to Balford's house to bring him dinner.  When Brown came back to the house, Annie Brown

---

[3] Establishing chain of custody for the screwdriver was not necessary because, prior to trial and during direct examination, Brown identified the screwdriver as the weapon he used to kill Balford. The issue is not raised on appeal.

testified Brown said, "Mama, call 911. Me and Pops been into it."[4] Annie Brown stated, ". . . we went up on the hill where Pops lived. I knocked on the door. [Brown] said, Mama, he's not going to answer. Go in. So we went inside the house. When I went inside the house, Pops was on his couch; so I ran out of my house, ran out of Pops' house, went into my house and called 911."

¶23.  Brown testified on his own behalf. Brown testified to the following :

Q. [BY DEFENSE COUNSEL:] Now what was your nickname for Mr Earlie?

A.     Pops.

Q.     How did you get that nickname for him?

A.     He told me one day when I bring him a plate of food.

Q.     On April 18, 2012[,] did you have occasion to bring him a plate of food?

A.     Correct.

Q.     Who gave it to you?

A.     My mother.

Q.     About what time?

A.     Around 7:00.

Q.     Had you seen Mr. Pops or Mr. Earlie earlier that day?

A.     Correct.

Q.     I take it you and he were getting along good is that right?

A.     Yes, sir.

---

[4]Balford's nickname was "Pops."

Q.     Now, when you went up–well, you had seen him earlier that day. What was he doing?

A.     He was working on his Ford Expedition truck that was broken down.

Q.     Did he have any other vehicles?

A.     Chrysler Plymouth.

Q.     What kind of shape was it in?

A.     It was broken down as well.

Q.     Okay. What else was he doing, if anything?

A.     He was frustrated because his truck was broken down.

Q.     Now, when you went up there, you had the plate of food in your hand. Did you have a screwdriver?

A.     No, sir.

Q.     What did you do when you approached his dwelling?

A.     I knocked on the door and I called his name

Q.     Then what happened?

A.     He opened the door and when he opened the door, he took a strike at me with a screwdriver.

Q.     Did he say anything when he struck at you with a screwdriver?

A.     No, sir.

Q.     What happened to the plate of food?

A.     I dropped it on the ground.

Q.      Have you seen that plate of food in any of the photographs law enforcement took?[5]

A.      No, sir.

Q.      Well, at that time he grabs at you. Where did he land? Where did he grab you?

A.      He grabbed the plate of food. Well, he didn't grab the plate of food. He tried to grab me by my neck. Well, he grabbed me by my neck and pulled me into the house.

Q.      He pulled you in the house?

A.      Yes, sir.

Q.      What did you do?

A.      I tried to get away from him; and I couldn't get away from him; and when I asked him what he was doing, he didn't say anything. Then when I tried to get away, I couldn't do nothing but just fight for my life.
        . . .

Q.      What happened next?

A.      When we got into the house, he fell on the couch. Once he fell on the couch, I was still holding onto his hand; and I pushed the screwdriver out of his hand; and it fell on the ground. Once it fell on the ground, I leaned over and grabbed it; and he put both his arms around my neck. When he put both his arms around my neck, I couldn't do nothing.

Q.      Where was the couch at?

A.      It was right beside the door.

Q.      Where was Mr. Pops, Mr. Earlie?

A.      He was laying on the couch, and he had his hands around my neck, and I grabbed the screwdriver.

---

[5] Law enforcement officials did not take any pictures outside Balford's home.

11

Q. What did you do with it?

A. I grabbed the screwdriver, and I asked him to let me go, and he never would.

Q. You stabbed him multiple times; is that right?

A. Yes, sir.

Q. Why is that?

A. Because he wouldn't never let me go.

During cross-examination, Brown positively identified the screwdriver he used to stab Balford. Brown also relayed his conversation with Dr. Lott.

Q. [BY PROSECUTOR STALLINGS:] Tell the jury what you told him happened.

A. I told him the exact same story I just told the jury; that I walked up on the hill with a plate of food my mom gave me to take up there that night. Once I took the food up there, I seen Mr. Earlie Balford walking to his home while he finished working on his truck. He had a tool in his hand; and while he was walking inside his home, I walked up from off the top of the hill to his home and knocked on the door. Once I knocked on the door, I had called his name; and when I called his name, I was looking down. When I was looking down, Pops had opened the door and struck me with a screwdriver. When he struck me with the screwdriver, it caught me by surprise; and I dropped the plate of food. Once I dropped the plate of food, I held onto his arm with the screwdriver; and he grabbed my neck. Once he grabbed my neck, he pulled me into his home; and when he pulled me into his home, me and him scuffled and fell on the floor. I mean, excuse me, on the ground. I mean on the couch; and once we fell on the couch, I asked Pops why was he doing this. He put both his arms around me. Once I knocked the screwdriver out of his hand, I asked him to please stop; and he never would; and I just got scared. I feared for my life because he was going to kill me; and it wasn't anything else I could do. He pulled me into his home, and I couldn't do anything but just pray to God that he wouldn't take my life, so I just grabbed the screwdriver, and I started grabbing him because I wanted him to let me go because he was going to take my life. I didn't mean to do it. I didn't mean to do it. I wish I wasn't even at his house that night.

12

The prosecutor then read from Dr. Lott's report which reflected that Brown had told Lott that earlier in the afternoon Balford had come to Brown's house with a battery charger and asked Brown " . . . if he would have sex with him, and Mr. Brown told him he would not have sex with him."

> Q. [BY PROSECUTOR STALLINGS:] You talked to the sheriff yesterday too, didn't you? When he brought you up here to the courthouse yesterday, didn't you ask the sheriff, Sheriff, do you want to know what really happened?
>
> A. Yes, sir.
>
> Q. And you told him a story similar to what you told them awhile ago?
>
> A. I told him the exact same story I just told the jury.
>
> Q. All that about the sex and that stuff, you didn't get into that, did you?
>
> A. No sir. I thought it wasn't even irrelevanat [sic] because he didn't never try to go that far into details. I didn't think that that was even, I mean, any kind of worries to me because I'm a heterosexual; and I don't dwell in homosexuals. That doesn't bother me because of somebody else's personal preference because if somebody is homosexual, I don't judge nobody because it says in the Bible that he who is without sin cast the first stone.

¶24.  At the close of the trial, Brown renewed his motion for a directed verdict on the ground that he was entitled to an acquittal. Brown's counsel argued, " [Brown was entitled] under *Weathersby*, to a directed verdict [of aquittal], [because his self-defense theory and eyewitness testimony was] not contradicted by facts, [and was] not contradicted by evidence that [Brown] was defending himself." The trial judge overruled this motion, finding, "I agree that physical facts as well as some testimony does not make this case come within the

13

*Weathersby*[6] rule. That motion is denied." Brown's request for peremptory instruction also was denied.

¶25. Following closing arguments, the jury returned with a verdict of guilty of murder. A poll of the jury, individually by name, reflected its verdict was unanimous. Thereafter, Brown was sentenced to life imprisonment.

¶26. On August 21, 2013, Brown, through counsel, filed a motion requesting judgment notwithstanding the verdict (JNOV), or alternatively, seeking a new trial.[7] The motion

---

[6]***Weathersby v. State***, 147 So. 481, 482 (1933) (reiterating the rule that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge") (citations omitted)).

[7]Brown made the following fourteen assertions:

1)      The jury's verdict entered in this cause is against the overwhelming weight of the evidence,

2)      [T]he [c]ourt erred by failing to suppress those certain statements made by the Defendant in the presence of law enforcement officers while in custody,

3)      [T]he Court erred in conducting the hearing of Defendant's Motion to Suppress Defendant's Statements in that the burden of showing such statements were proper and not in violation of the Defendant's constitutional rights was shifted to the Defendant in an untimely manner and not born[e] by the State of Mississippi,

4)      After the objection by the Defendant, the testimony of Dawn Cannon, the E-911 dispatcher, should not have been allowed by the [c]ourt in that such testimony was hearsay and was not testimony which should have been allowed under any of the hearsay exceptions,

5)      The testimony of Deputy Kenneth White placed before and unto the Jury as the second witness of the State's case in chief as to Defendant's admission inflamed the Jury and the [c]ourt erred in failing to order a mistrial,

6)      The [c]ourt erred in failing to suppress the statement made by the Defendant

14

was denied without explanation by an order of the court entered on August 29, 2013. Brown

file notice of appeal *pro se* on September 19, 2013.[8]

¶27.    On appeal, Brown raises the following five issue:

I.      **Whether Brown was provided ineffective assistance of counsel at trial and pretrial proceedings, in violation of the Sixth Amendment to the United States Constitution.**

---

to Deputy Keith Thacker upon the initial questioning of the Defendant by Deputy Thacker,

7)      The [c]ourt erred in allowing into evidence the multiple color photographs of the victim Earlie Balford in that such photographs were inflammatory and of such a nature that they played upon the emotions of the jury,

8)      The [c]ourt erred in allowing the testimony of Julia Cruthirds in that her testimony was of such general nature that it should not have been allowed under the hearsay exceptions Rules 803(3) and 804(b)(5),

9)      The [c]ourt erred in overruling Defendant's Motion to Quash Indictment at the close of the state's case in chief,

10)     The [c]ourt erred in overruling Defendant's Motion for Directed Verdict at the close of the State's case in chief,

11)     The [c]ourt erred in allowing a screwdriver to be introduced as the murder weapon where no chain of custody of the screwdriver was established,

12)     The [c]ourt erred in failing to grant Defendant's Motion for Directed Verdict pursuant to the Weathersby Rule under ***Weathersby v. State***, 147 So. 481 (1933),

13)     The [c]ourt erred in failing to sustain objections made by the Defendant as to the introduction of evidence and testimony which collectively resulted in a denial of subst[an]tive due process unto the Defendant, and

14)     The [c]ourt erred in failing to properly instruct the jury as to the proper law in these premises.

[8]Shortly thereafter, Brown filed an affidavit of poverty and was appointed representation to appeal his conviction *in forma pauperis*.

**II.** **Whether the trial court erred in failing to grant Brown's instructions, D-4, D-5, D-6, and D-8 manslaughter instructions.[9]**

**III.** **Whether the trial court erred by denying Brown's motion for a directed verdict of acquittal at the close of the State's case, by denying Brown's requested peremptory instruction, and by denying Brown's motion for judgment notwithstanding the verdict if the verdict was contrary to law.**

**IV.** **Whether the trial court erred by denying Brown's motion to elicit testimony from the State's evaluating psychologist.**

**V.** **Whether Brown suffered cumulative error that deprived him of a fair trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution.**

## DISCUSSION

**I.** **Whether Brown was provided ineffective assistance of counsel at trial and pretrial proceedings, in violation of the Sixth Amendment to the United States Constitution.**

¶28.   Brown's claim is predicated on the assertion that Brown's trial counsel should have encouraged him to testify to Balford's alleged history of sexual abuse and Balford's attempt to commit a felony by seeking to molest Brown prior to his death.   Introduction of such facts, Brown argues on appeal, would have supported manslaughter and self-defense instructions on Brown's behalf.   But the record indicates Brown did receive adequate self-defense and manslaughter instructions.   Further, even without testimony or evidence of the alleged molestation, Brown had established a sufficient basis upon which to found a claim of self-defense or manslaughter.   *See* Issue II, below.

---

[9]In his brief, Brown asserts that instruction D-7, a manslaughter instruction, was denied by the trial court as well. Brown's inclusion of instruction D-7 in Issue II appears to have been a mistake as the instruction appears from the trial transcripts to have been given to the jury.

16

¶29. Brown also suggests that his counsel was ineffective for failing to request a new trial on the basis that the State failed to produce evidence on each of the statutory elements in order to convict Brown of murder. Brown's third assignment of error on appeal, however, is that the trial court erred by denying Brown's motions to quash his indictment, for a directed verdict, or alternatively, for a new trial. Therefore, the trial court cannot have erred by failing to grant these motions and Brown's counsel did not fail to make them. Because Brown's counsel did make such motions, the claim is without merit.

**II. Whether the trial court erred denying Brown's jury instructions, D-4, D-5, D-6, and D-8 for the lesser offense of manslaughter.**

¶30. This Court reviews a trial court's decision to grant or deny a jury instruction under an abuse-of-discretion standard and considers an instruction in the context of all the jury instructions as a whole. *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009) (citing *Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001). Jurors must be given appropriate instructions that fairly announce the law applicable to the case so as not to create an injustice against the defendant. *Id.* The trial court may and should refuse an instruction when it incorrectly states the law, when it is covered adequately in other instructions already given, or when it is unsupported by the evidence. *Id.* (citing *Phillipson v. State*, 943 So. 2d 670, 671 (Miss. 2006)); *see also Norman v. State*, 385 So. 2d 1298, 1301 (Miss. 1980) (holding "Instructions unsupported by the evidence need not, and should not be given.")

¶31. Brown argues the trial court erred in refusing four of his manslaughter instructions, although the instructions submitted by Brown's counsel and the State were nearly identical. The trial court refused instructions D-4 and D-5, finding that they were cumulative in light

17

of instruction S-3, which defined manslaughter and its differences from murder, while also supplying the verdict forms for both. The trial court refused D-6 as "confusing" and found that the instruction already was covered by S-3. Lastly, the trial court refused D-8, as the judge found it was cumulative in light of another instruction, D-7, also defining heat-of-passion manslaughter.

¶32. Brown asserts the four instructions should have been presented to the jury because Brown had established an evidentiary basis for a manslaughter or self-defense finding at trial. And, while it is true that Brown did establish such a basis by his testimony that Balford attacked him, Brown fails to distinguish his proffered instructions from S-3 and D-7 such that D-4, D-5, D-6, or D-8 would not be repetitive. Because the instructions were redundant, there is no support for the suggestion that the trial court abused its discretion when it denied D-4, D-5, D-6, or D-8 in favor of instructions S-3 and D-7. *See Montana v. State*, 822 So. 2d 954, 961 (Miss. 2002) ("A trial judge is under no obligation to grant redundant instructions."). We find Brown's contention in Issue II to be without merit.

    **III.    Whether the trial court erred by denying Brown's motion for a directed verdict of acquittal at the close of the State's case, by denying Brown's requested peremptory instruction, and by denying Brown's motion for judgment notwithstanding the verdict if the verdict was contrary to law.**

¶33. The standard of review for a trial court's denial of a motion for directed verdict, peremptory instruction or judgment notwithstanding the verdict (JNOV) is identical. *Hawthorne v. State*, 835 So. 2d 14, 21 (Miss. 2003)(citing *Coleman v. State*, 697 So. 2d 777,787 (Miss. 1977)). A motion for JNOV, motion for directed verdict, and a request for

18

peremptory instruction all challenge the legal sufficiency of the evidence. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court." *Id*. This Court considers the evidence in the light most favorable to the State, giving the State "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Collier v. State*, 711 So. 2d 458, 461 (Miss. 1998) (citation omitted). This Court asks whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). All credible evidence supporting the defendant's guilt will be accepted as true. *McRee v. State*, 732 So. 2d 246, 249 (Miss. 1999).

¶34. On appeal, Brown argues that the trial judge should have granted his motion for directed verdict at the close of the State's case-in-chief, on the basis that the State failed to submit evidence of malice to the jury, and because malice was an essential element of his conviction. Claiming insufficiency, Brown posits that, absent evidence of malice, he should have been acquitted. On the issue of legal sufficiency, reversal can occur only when evidence of one or more of the elements of the charged offense is such that reasonable and fair minded jurors could only find the accused not guilty. *Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987).

19

¶35. This Court has held that malice, or deliberate design, may be inferred from use of a deadly weapon.[10] ***Tran v. State*** , 681 So. 2d 514, 517-18 (Miss. 1996); ***Day v. State***, 589 So. 2d 637, 642 (Miss. 1991); ***Wilson v. State***, 574 So. 2d 1324, 1337 (Miss. 1990); ***McGowan v. State***, 541 So. 2d 1027, 1030 (Miss. 1989); ***Nicolaou v. State***, 534 So. 2d 168, 171-72 (Miss. 1988); ***Russell v. State***, 497 So. 2d 75, 76 (Miss. 1986); ***Dickins v. State***, 43 So. 2d 366, 373 (Miss. 1949). This Court has held that "deliberate-design connotes an intent to kill and may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." ***Wilson v. State***, 936 So. 2d 357, 364 (Miss. 2006). Deliberate design, as a matter of law, may be inferred through the intentional use of any instrument, which, based on its manner of use, is calculated to produce death or serious bodily injury. ***Fairchild v. State***, 459 So. 2d 793, 802 (Miss.1984).This Court has elaborated on the use of a deadly weapon, holding:

> The use of a deadly weapon is *prima facie* evidence of malice, because a man must be taken to intend the necessary and usual consequences of his act. To shoot or stab, or strike with a bludgeon, indicates a purpose to take life; *but if the one or the other be employed to disable an adversary, in the very act of making a murderous and malicious assault then the presumption is overcome*. The proof of the use, in the case hypothecated, of the deadly weapon, with attending circumstances, would show the excuse. Where the circumstances of the killing are known, and in evidence to the jury, the deductions and inferences should be made from all the facts. . . . What we mean to affirm is,

---

[10] Malice aforethought, premeditated design, and deliberate design all mean the same thing. ***Hawthorne***, 835 So. 2d at 19. By definition, malice aforethought and deliberate design are synonymous. *Id*. This Court also has acknowledged that deliberate design connotes an intent to kill and indicates a full awareness of what one is doing and generally implies careful and unhurried consideration of the consequences. ***Jones v. State***, 710 So. 2d 870, 877 (Miss. 1998). Design means to calculate, plan, or contemplate. *Id.* However, deliberate design to kill a person may be formed quickly and perhaps only moments before the act. *Id.*

that where the mode, manner and circumstances of the killing are in evidence to the jury (although life was taken by a deadly weapon), the character of the act, whether criminal or not, and then its grade, whether murder or manslaughter, or whether excusable or not, is to be gathered from the entire body of the testimony.

*Head v. State*, 44 Miss. 731, 753-54 (1870). Brown relies on this Court's holding in *Weathersby*. In *Weathersby v. State*, 147 So. 481, 482 (Miss. 1933), this Court held, "[W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the State, or by the physical facts or by the facts of common knowledge." Further, the rule is used as a guide for whether a judge should grant a directed verdict, and a defendant who meets the *Weathersby* standard is entitled to a directed verdict of acquittal. *Blanks v. State*, 547 So. 2d 29, 33-34 (Miss. 1989). The rule is not applicable where the defendant's version of the story is unreasonable or contradicted by physical facts. *Id*.; *Buchanan v. State*, 567 So. 2d 194, 197 (Miss. 1990). Where the *Weathersby* rule does not require a directed verdict of acquittal, it becomes a jury issue as to whether or not to believe the defendant's testimony on how the killing occurred. Because Brown was the only witness to Balford's death, the operative question under *Weathersby* is whether the State's evidence "substantially contradicted" Brown's testimony by "material particulars" or "physical facts." If not, Brown's self-defense theory must be accepted as true.

¶36.   In *Russell v. State*, 497 So. 2d 75 (Miss. 1986), this Court affirmed a conviction for murder despite Russell's argument that the State did not establish malice aforethought as an

21

essential element of his murder conviction. *Id.* at 75. Russell contended that the inference of malice was overcome by his claim of self-defense, but this Court found "that claim was fairly presented to the jury and resolved against him." *Id.* at 76. In *Russell*, witnesses testified that, on one occasion, Russell stated he was looking for the victim in order to kill him, and on another occasion, Russell walked into a bar, pointed his finger at the victim, and then told the victim "I've got more for you if that don't do you" before pulling out a knife and stabbing him to death. *Id*. In light of the evidence, this Court explicitly held, "The jury's rejection of Russell's claim of self-defense was supported by the evidence, which indicated that Gaines was unarmed and that he was stabbed after Russell had stated his desire to kill him." *Id.* at 76-77.

¶37.    Similarly, in *Nicolaou v. State*, 612 So. 2d 1080 (Miss. 1992), this Court affirmed another conviction for murder where the appellant claimed insufficient evidence of malice aforethought had been presented. Specifically, Nicolaou argued the State presented no proof that he did not act in self-defense. This Court affirmed for a few reasons. First, the physical facts precluded a self-defense theory because Nicolaou admitted tying up his victim, causing a state of incapacitation, before beating him to death. *Id*. at 171. Second, Nicolaou did not offer testimony or evidence that supported his self-defense theory, because Nicolaou said he could not remember beating or killing the victim. Accordingly, this Court affirmed the conviction on the basis that "there was ample evidence for the jury." *Id*. at 172.

¶38.    In the case *sub judice*, Brown offered no evidence of excuse or justification other than his own testimony that Balford was engaged in strangling Brown at the time Brown inflicted

22

the lethal injuries. The State, on the other hand, presented crime-scene photographs and medical testimony to the jury detailing Balford's numerous stab wounds. The jury also was made aware that Brown was an athletic twenty-eight-year-old, while Balford was a small sixty-seven-year-old at the time of his death. Further, officers testified that they did not observe defensive or other wounds while interrogating Brown following Balford's death. Additionally, the jury heard Poynor's testimony that Brown had said he had killed Balford because "[Balford] talked too much," and Cruthirds's testimony that Balford planned to move to another neighborhood because the neighborhood kids were becoming violent. Lastly, the jury considered Brown's letter, apologizing to Balford's son for "murdering" Balford. Accordingly, we find the evidence presented could be deemed by a jury, within its exclusive purview to make such determinations, to "substantially contradict" Brown's self-defense theory when viewed in the light most favorable to the State or the verdict.

¶39. Presiding Justice Dickinson opines in his separate opinion to concur in result and in part that "some of this evidence indeed contradicts Brown's theory; some does not." In elaborating on his position that the evidence cited in this opinion "contradicts Brown's [self-defense] theory in no conceivable way," Justice Dickinson's opinion overreaches by attempting to make determinations reserved solely for the jury. The separate opinion asserts, "the numerous stab [wounds] corroborate, rather than contradict, Brown's testimony" and that "numerous stab wounds fit neatly into [a self-defense] theory." To opine so is to assume the role of a fact-finder, where in this case, the jury could have decided the numerous lethal stab wounds evidenced Brown's intent to kill rather than an intent to defend. Similarly, the

23

separate opinion finds that the age and size of the victim and Brown are factors that do not contradict Brown's self-defense theory, and that the victim's voiced fear of violence from "neighborhood kids" is "irrelevant." As stated, these are all questions appropriately answered by the jury.

¶40.    As noted earlier, *Weathersby* is not only employed in inquiries related to the grant or denial of peremptory instructions; it is also used as a guide for whether a judge should grant or deny a motion for directed verdict. Specifically, a defendant who meets the *Weathersby* standard is entitled to a directed verdict of acquittal. *Blanks*, 547 So. 2d at 33-34 (holding "The *Weathersby* rule, as *Harveston* [*v. State*, 493 So. 2d 365 (Miss. 1986)] makes clear, is not a jury instruction, but a guide for the judge in determining whether a defendant is entitled to a directed verdict.") Again, the rule is not applicable where the defendant's version of the story is unreasonable or contradicted by physical facts. *Buchanan*, 567 So. 2d at 197. And upon an assignment of error regarding directed verdict, we are required by this Court's limited scope of review to accept all credible evidence consistent with the verdict as true and to give the State the benefit of all favorable inferences drawn therefrom. *Id*.; Where the *Weathersby* rule does not require a directed verdict of acquittal, whether or not to believe the defendant's testimony on how the killing occurred is a matter for the jury to decide. The contentions raised by the separate opinion seem to conflate *Weathersby* analysis for peremptory instructions with the analysis for the denial of a directed verdict.

¶41.    The instant case is similar to *Russell* and *Nicolaou*.  Here, the State's medical examiner, Dr. LeVaughn, testified that three of the eighteen puncture wounds Balford

24

sustained were lethal. In particular, Dr. LeVaughn opined, any one of the stabs to Balford's liver, left lung, and neck independently would have resulted in Balford's death. Therefore, according to caselaw cited above, a screwdriver used to inflict such injuries could be considered a deadly weapon. With eighteen puncture wounds, malice may be inferred. *See Fairchild*, 459 So. 2d at 802; *see also Head*, 44 Miss. at 754. ( holding that "If [the accused] offers no explanation of the killing; if he fails to show that it was an act of necessity, done *se defendendo*, the inference of malice, from the use of the deadly weapon, remains."

¶42. Also similar to *Russell* and *Nicolaou*, the State, in the instant case, presented other evidence of malice. This evidence consisted of Deputy Poynor's testimony that Brown had said he killed Balford because Balford "talked too much" and Brown's letter to Balford's son apologizing for "murdering" Balford. In light of the testimony and the letter, we find the instant facts are not analogous to the situations contemplated by this Court in cases where "less patent" evidence may warrant reversal. In fact, such a conclusion would lend itself to the weight of the evidence and not to sufficiency, which is the claim made in this appeal. Thus, the trial court did not err by denying Brown's motion for a directed verdict of acquittal at the close of the State's case, by denying Brown's requested peremptory instruction, or by denying Brown's motion for JNOV or a new trial.

### IV. Whether the trial court erred by denying Brown's motion to elicit testimony from the State's evaluating psychologist.

¶43. A trial judge enjoys a great deal of discretion as to the relevance and admissibility of evidence. *Walker v. State*, 878 So. 2d 913, 915 (Miss. 2004). However, this discretion must be exercised within the confines of the Mississippi Rules of Evidence. *Cox v. State*, 849 So.

2d 1257, 1268 (Miss. 2003); M.R.E. 103(a). Reversal is proper only where such discretion has been abused and a substantial right of a party has been affected. *Id.* The trial court's discretion also must insure the constitutional right of the accused to present a full defense in his or her case. *United States v. Stewart*, 104 F. 3d 1377, 1384 (D.C. Cir. 1997).

¶44.    The admissibility of expert testimony is evaluated in light of Mississippi Rule of Evidence 702, which holds that such testimony may be introduced when it is found to be relevant and reliable. *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 38 (Miss. 2003); *see also* M.R.E. 702. Testimony is relevant if it will assist the trier of fact in understanding or determining a fact at issue. *Id.*

¶45.    In the instant case, Brown sought to introduce testimony from Dr. Lott, who, upon joint motions from the State and the defense, performed a psychiatric evaluation on Brown to assess whether Brown was competent to stand trial.  Brown sought to elicit testimony from Dr. Lott regarding Dr. Lott's positive opinion of Brown's propensity for truthfulness.  Dr. Lott, though, was admitted as an expert in psychiatry and not as a character witness.  Dr. Lott offered nothing to Brown's defense  to which Brown had not already testified. Further, Dr. Lott said only that Brown appeared to be truthful with respect to his sanity and competence to stand trial.  Dr. Lott offered no opinion regarding Brown's truthfulness concerning Balford's death.  We find the trial court did not err in excluding Dr. Lott's testimony.

V.      **Whether Brown suffered cumulative error that deprived him of a fair trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution.**

¶46.   Because Issues I, II, III, and IV have been resolved in the negative, Brown's fifth issue raised on appeal is without basis.

## CONCLUSION

¶47.   For the foregoing reasons, we affirm the judgment of the Calhoun County Circuit Court.

¶48.   **CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT SHALL BE GIVEN CREDIT FOR ALL DAYS SPENT IN CUSTODY AWAITING TRIAL.**

**WALLER, C.J., RANDOLPH, P.J., LAMAR, KING AND COLEMAN, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ.; LAMAR AND COLEMAN, JJ., JOIN IN PART.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, *must* be accepted as true, *unless substantially contradicted* in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.[11]

¶49.   This excerpt from ***Weathersby v. State*** has been the law in Mississippi since before any current member of this Court was born. In the case before us, the defendant's testimony established a reasonable self-defense theory, and he was the only eyewitness to the crime. But, because the State's evidence substantially contradicted that theory, I agree that Brown

---

[11] ***Weathersby v. State***, 165 Miss. 207, 147 So. 481, 482 (1933) (emphasis added) (citing ***Gray v. State***, 158 Miss. 266, 130 So. 150 (1930) ***Walters v. State***, 153 Miss. 709, 122 So. 189 (1929); ***Wesley v. State***, 153 Miss. 357, 120 So. 918 (1929); ***Patty v. State***, 126 Miss. 94, 88 So. 498 (1921), *overruled on other grounds by **Harrison v. State***, 534 So. 2d 175 (Miss. 1988); ***Houston v. State***, 117 Miss. 311, 78 So. 182 (1918)).

was not entitled to a peremptory instruction under ***Weathersby***. But the majority, in its effort to explain why the State's evidence contradicted that theory, goes too far by citing evidence that contradicts Brown's theory in no conceivable way.

¶50.    The majority stretches several pieces of evidence far beyond their logical relevance and probative value, and then claims the evidence contradicts Brown's self-defense theory. The majority points out that Balford suffered numerous stab wounds; that Brown was substantially younger and larger than Balford; that officers did not observe any defensive wounds on Brown; that Brown had stated he killed Balford because he "talked too much;" that Balford intended to move from the neighborhood because he feared neighborhood kids; and that Brown wrote a letter apologizing to Balford's family for "murdering" Balford. While some of this evidence indeed contradicts Brown's theory, some does not.

¶51.    First, the numerous stab wounds corroborate, rather than contradict, Brown's testimony. Brown's self-defense theory described a battle to death in which Brown grabbed the screwdriver and began swinging at Balford, while Balford attempted to choke him to death. Numerous stab wounds fit neatly into this theory. Second, the size and age discrepancies fail to contradict Brown's defense. While this evidence certainly tends to show that Brown would have the upper hand in the confrontation he described, it does not suggest that the confrontation never occurred.

¶52.    Next, the fact that Balford intended to move from the neighborhood out of fear is irrelevant in the absence of evidence that he feared Brown in particular. Finally, Brown's

28

letter contradicts his self-defense theory only if one assumes that Brown used "murdering" as a legal term of art, not as a synonym for killing.

¶53.    The majority incorrectly suggests that I would improperly infringe on the jury's discretion by making a judgment on the significance of certain evidence. The jury has no discretion in this matter because a decision concerning whether to grant a *Weathersby* instruction is not made by a jury. The trial judge must review the evidence to determine whether the jury instruction is proper. Said differently, to know whether the defendant is entitled to a *Weathersby* instruction, the trial judge—not the jury—must view the evidence and determine whether the requirements have been met.

¶54.    I do not quarrel with the established concept that juries are entitled to discretion in their factual findings. But, even if the *Weathersby* decision had to be made by a jury, I remind my esteemed colleagues that the burden of proof in a criminal case is beyond a reasonable doubt, and a jury's discretion goes only so far. There is a good reason why trial judges instruct juries that they are not to speculate or guess.

¶55.    That said, I agree that Brown's statement to police and lack of defensive wounds sufficiently contradicted Brown's testimony to survive the *Weathersby* rule and create a jury issue. So I concur in part and in result.

   **KITCHENS AND CHANDLER, JJ., JOIN THIS OPINION. LAMAR AND COLEMAN, JJ., JOIN THIS OPINION IN PART.**

29