# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00555-COA

**CHRISTOPHER LEE THOMPSON A/K/A**               **APPELLANT**
**CHRISTOPHER THOMPSON A/K/A**
**CHRISTOPHER L. THOMPSON**

**v.**

**STATE OF MISSISSIPPI**                             **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/19/2016 |
| TRIAL JUDGE: | HON. JAMES SETH ANDREW POUNDS |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LUANNE STARK THOMPSON |
| | TIFFANY LEIGH KILPATRICK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOSEPH SCOTT HEMLEBEN |
| DISTRICT ATTORNEY: | J. TRENT KELLY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED: 06/12/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE GRIFFIS, P.J., BARNES AND GREENLEE, JJ.

### GRIFFIS, P.J., FOR THE COURT:

¶1. Christopher Lee Thompson was convicted of manslaughter in violation of Mississippi Code Annotated section 97-3-35 (Rev. 2014). On appeal, he argues that the trial court erred in denying his motion for a directed verdict pursuant to the *Weathersby*[1] rule. We find no error and affirm.

FACTS

---

[1] *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933).

¶2.    Around 5:30 a.m. on March 4, 2014, Thomas James called 911 and reported that he believed that his brother-in-law, Thompson, had killed someone. The dispatcher later testified that Thompson told James that "[Thompson] thought he killed [Thomas Harlow because] he had pushed his eyes into the back of his head." James gave the dispatcher Thompson's address, and authorities were dispatched. Deputy Wayne Wilbanks went to Thompson's house and questioned him. Meanwhile, Deputy Patrick Chism was dispatched to the scene of the crime at Harlow's sister's trailer. Upon his arrival, Deputy Chism entered the trailer and found Harlow's dead body. He was later joined by Investigator Brandon Davis.

¶3.    Davis testified that the body was found in a bedroom where it was evident that Harlow had been badly beaten and an altercation had taken place. Harlow was "black and blue" and had blood running from his head and eyes. Potted plants had been overturned, and there was an overturned television on the ground near Harlow's body. After investigating the crime scene, Davis interviewed Thompson at the police station.

¶4.    During the interview, Thompson said that he and his wife had been out drinking with Harlow until the early morning of March 4. After leaving a bar, the three went to Harlow's sister's trailer to continue drinking and listen to music. When Thompson suggested it was time to go home, Harlow offered to let Thompson and his wife sleep in a spare bedroom to avoid driving home drunk. Thompson agreed, and everyone went to sleep.

¶5.    Thompson testified that at about 2:00 a.m., he was awoken by someone pulling off his underwear and performing oral sex. Thompson initially thought it was his wife, but he soon

2

discovered that it was Harlow. It was undisputed that an altercation followed, but the precise events varied to some extent when Thompson relayed them to people.

¶6. Thompson's brother-in-law, James, encountered Thompson not long after the incident. According to James, "[Thompson] said he hit [Harlow]. They were scuffling. [Thompson] said he grabbed [Harlow's] head and shoved his thumbs in his eyes. [Thompson] picked up a TV and hit [Harlow] with it. And after that [Thompson] said he realized [Harlow] wasn't moving [anymore] and [Thompson and his wife] left." James stated that he told Thompson that they needed to call the police and have someone check on Harlow, but Thompson declined. James then secretly called 911 and the dispatcher sent officers to Thompson's house and ultimately to the scene of the crime at Harlow's sister's trailer.

¶7. Thompson's account to Wilbanks was slightly different. Thompson told Wilbanks that after Harlow woke him up, he started punching Harlow and screaming for his wife to turn on the lights. The lights came on and he heard Harlow fall on the floor. Thompson told Wilbanks he "thought he had knocked [Harlow] out because he heard [Harlow] moan." Thompson and his wife then left. Thompson did not mention the television or gouging Harlow's eyes.

¶8. During Davis's interview, Thompson said that when he discovered that it was Harlow who was performing oral sex, Thompson grabbed Harlow's hair and punched him three or four times and told his wife to turn on the light. Thompson stated that he and Harlow ended up on the floor and Thompson elbowed Harlow. By the time that Thompson's wife turned on the light, Harlow was knocked out, so Thompson and his wife left the scene. During the

3

interview, Thompson denied hitting Harlow with anything other than his fists, including the overturned television set. He also stated that he did not believe that Harlow needed medical attention or that he had gouged Harlow's eyes. Davis swabbed Thompson's penis. Testing later confirmed the presence of Harlow's DNA. This evidence was admitted during trial and the recorded interview was played for the jury.

¶9.     At trial, Thompson himself testified that after he discovered it was Harlow, he grabbed Harlow by the hair and screamed for his wife to turn on the lights. Thompson testified that because Harlow was significantly larger than him and attempting to get to his feet, Thompson pushed Harlow backward into a dresser, knocking off the items that were on top of the dresser in order to escape. Thompson stated he tried to escape the still pitch-black room by throwing the television out of his way. According to Thompson, he and Harlow got tangled up again on the floor with Thompson on top. Thompson stated that in order to escape, he elbowed Harlow twice and unknowingly pressed his fingers into Harlow's eyes. By this time, Harlow's grip loosened, the lights came on, and Thompson and his wife fled the trailer.

¶10.    The jury also heard from Dr. Mark Levaughn, the chief medical examiner for the state of Mississippi. He testified that he performed Harlow's autopsy, and Harlow's death resulted from "multiple blunt traumatic injuries." He described Harlow's injuries as follows:

> [S]tarting from the head to the toe, there was a large contusion, about ten centimeters, which is about four or five inches, on the left [side of Harlow's] forehead. There was an abrasion or scrape mark and a small laceration or a tear along the left eye on the cheek bone. There was contusion on the lips and the mouth. There was massive hemorrhage in both eyes. There were two separate areas of bruising in the back of the neck. There were abrasions on the

4

elbows and there were some abrasions on the left chest, the abdomen area. Internally there was bleeding of the surface of the brain and there was actually a tearing of a small area of the brain tissue itself.

Dr. Levaughn went on to testify that since fingers and televisions are blunt objects, he agreed with the State that the hemorrhaging on the surface of the eyes could be consistent with fingers pushing into the eyes and that the head injuries could be consistent with a television. However, he also stated that a television is not the only thing that could have caused the head injuries. Regardless, Dr. Levaughn ultimately concluded that Harlow's injuries were not consistent with "one or two blows."

¶11. The jury heard and considered these accounts of what happened from numerous witnesses including Thompson himself, as well as the conclusions from Dr. Levaughn. The circuit court also instructed the jury on Thompson's claim of self-defense. Thompson was convicted of heat-of-passion manslaughter and sentenced as a nonviolent habitual offender to serve twenty years, day-for-day with credit for time served, in the custody of the Mississippi Department of Corrections. Thompson was ordered to pay a $1,000 fine and restitution of $6,500 to the Mississippi Crime Victim's Compensation Fund and $938 to Harlow's sister, Sheila Randle.

## ANALYSIS

¶12. Thompson argues that the trial court erred in denying his motion for a directed verdict pursuant to the *Weathersby* rule. On appeal he argues that because he was the only eyewitness presented at trial able to testify to the events surrounding Harlow's death, and his account was uncontradicted by any material particulars, either from other witnesses that

testified at trial or physical evidence, his account must be accepted as true in accordance with the *Weathersby* rule. Therefore, Thompson argues that his conviction must be overturned.

¶13.    In a criminal proceeding, in order to determine whether the evidence was sufficient to sustain a conviction in the face of a motion for a directed verdict, "the critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed." *Bryant v. State*, 232 So. 3d 174, 178-79 (¶7) (Miss. Ct. App. 2017). "Where the evidence fails to meet this test, it is insufficient to support a conviction." *Id.* at 179 (¶7). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jones v. State*, 904 So. 2d 149, 153-54 (¶12) (Miss. 2005).

¶14.    In *Weathersby*, 165 Miss. at 207, 147 So. at 482, the Mississippi Supreme Court held that:

> where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

The supreme court has recognized that:

> [t]his rule simply makes it mandatory for the court and jury to accept the testimony of the defendant who testifies that the defendant acted in self-defense where there is no testimony to contradict his version of the homicide, and where there are no physical facts or evidentiary circumstances on which a contrary finding could be reasonably predicated.

*Johnson v. State*, 346 So. 2d 927, 929 (Miss. 1977).

6

¶15. "[T]he rule is used as a guide for whether a judge should grant a directed verdict, and a defendant who meets the *Weathersby* standard is entitled to a directed verdict of acquittal." *Brown v. State*, 176 So. 3d 1, 13 (¶35) (Miss. 2015). "The applicability of the *Weathersby* rule is a determination for the court. . . ." *Johnson v. State*, 987 So. 2d 420, 425 (¶10) (Miss. 2008). However, "[t]he rule is not applicable where the defendant's version of the story is unreasonable or contradicted by physical facts." *Brown*, 176 So. 3d at 13 (¶35). Stated differently, "[w]here the physical facts and circumstances in evidence materially contradict the defendant's version of what happened, the Circuit Court is not required to direct a verdict under *Weathersby*. Rather, the matter then becomes a question for the jury." *Buchanan v. State*, 567 So. 2d 194, 197 (Miss. 1990).

¶16. On appeal Thompson contends that none of the testimony or physical evidence presented at trial materially contradicted his recitation of events of the night that Harlow died. The State submits that Thompson's testimony was materially contradicted by the physical evidence and the various statements he made prior to trial. In rebuttal, Thompson argues that "[t]he State has not presented substantial contradictions in material particulars." We disagree with Thompson.

¶17. Thompson seems to ignore Dr. Levaughn's testimony. Dr. Levaughn testified that Harlow's injuries were inconsistent with one or two blows—which contradicts Thompson's testimony as discussed in further detail below. Rather, Dr. Levaughn opined that Harlow's death was a homicide caused by multiple instances of "severe blunt force trauma" or "beating" with "the most significant injuries [being] the injuries to the head, which caused

7

brain injury and ultimately death." He indicated that hemorrhaging on Harlow's brain and eyes could have at least caused "severe visual impairment" or blindness while Harlow was still alive and was "very consistent" with fingers being pushed forcefully into the eyes. These findings clearly contradict Thompson's testimony. Thompson conceded as much when asked whether it was "clear that there were a great many more injuries to [Harlow] than [he] described to either [Davis] or on the stand[.]"

¶18. Likewise, as highlighted previously, the versions of events that Thompson testified to at trial was inconsistent with accounts that he gave to Wilbanks, Davis, and James; as each of their versions also vary from each other. In other words, Thompson's account varied from witness to witness.

¶19. At trial, James testified that Thompson told him just hours after Harlow's death that Thompson hit Harlow with the television and gouged Harlow's eyes. Thompson mentioned the television during his testimony, but only in the context of moving it out of his way so that he could exit the room. Meanwhile, Thompson denied using the television in his interview with Davis and failed to mention the television at all when speaking with Wilbanks.

¶20. During his testimony, Thompson stated that he elbowed Harlow while struggling to escape. He told Wilbanks that he punched Harlow after he discovered that Harlow was performing oral sex on him, and he and his wife left after she turned on the light. During his interview with Davis, Thompson stated that he hit Harlow with his elbow and knocked Harlow out, and then he and his wife left. He denied hitting Harlow with anything other than his fist. He also denied that he had gouged Harlow's eyes.

¶21.    Thompson's own account and the versions of his accounts from other witness, as well as Dr. Levaughn's testimony, were materially contradicted by each other especially when considering the severity of Harlow's injuries.  In the similar case of *McElwee v. State*, 255 So. 2d 669, 671 (Miss. 1971), the supreme court stated:

> It is true that [the] appellant was the only eyewitness to the shooting, but his own voluntary statement to the sheriff and the investigator to some extent contradicted his testimony given at the trial.  These contradictions together with the fact that [the] appellant immediately left the scene and never reported the incident to the sheriff or anyone else, were sufficient to take the case out of the *Weathersby* rule.

Likewise, Thompson's statements to Wilbanks and Davis, as well as his brother-in-law, James, to some extent contradict his trial testimony.  Additionally, Thompson fled the scene of the crime and did not report the incident to the police.  In fact, he declined James's recommendation that he do so, which prompted James to call 911.

¶22.    The *Weathersby* rule "is inapplicable when the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Parvin v. State*, 212 So. 863, 871 (¶18) (Miss. Ct. App. 2016) (internal quotation mark omitted).  Therefore, we find that Thompson was not entitled to a directed verdict based on the *Weathersby* rule due to several material contradictions throughout his trial.  The trial court properly denied the motion for a directed verdict pursuant to *Weathersby*, as Thompson's trial testimony was inconsistent with the physical evidence and the various accounts that he gave to others.

¶23.    Since the *Weathersby* rule has no application in this case, the matter was correctly placed in the hands of the jury without giving a jury instruction regarding the *Weathersby*

9

rule. *See Thomas v. State*, 818 So. 2d 335, 349-50 (¶¶48-50) (Miss. 2002). This issue is meritless.

¶24. **AFFIRMED.**

**LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**